KIRK v. EZELL et al.

No. 18523.   Opinion Filed May 21, 1929.

John E. Luttrell and Hardin Ballard, for plaintiff in error.

Hardie & Grim, for defendants in error.

DIFFENDAFFER, C. Plaintiff in error was defendant, and defendants in error were plaintiffs below. The parties will herein be referred to as in the trial court.

Plaintiffs bring this action to recover the sum of $242.54 claimed due as commission on the sale of certain property, the same being a stock of groceries and a warehouse. The petition does not allege an express contract for commission for effecting the sale, and the allegations of the petition in that respect being:

"That on or about the 8th day of October, 1925, the said defendant employed and authorized these plaintiffs to sell a certain stock of merchandise, together with a certain warehouse located on the real estate, more particularly described as follows, to wit: Lot 20 in blk. 13, original townsite, Norman, Cleveland County, Okla., for the sum of $4,850.94, but nothing was said as between these plaintiffs and said defendant as to the amount of commission and compensation to be allowed these plaintiffs in representing said defendant in connection with the sale of said property."

It was then alleged, in substance, that plaintiffs introduced defendant to one R. D. Robey, who thereafter bought the property from defendant for $4,850.94; that the sale was consummated through the efforts of plaintiffs; that the customary and reasonable commission charged in transactions of this character is five per cent.; that defendants refused to pay same.

Plaintiffs apparently rely upon an implied contract of employment. Defendant answered by general denial and by special denial that he ever employed plaintiffs or authorized them to sell the property, or that he agreed to pay plaintiffs any sum whatever for the sale of the property.

The cause was tried to a jury, resulting in a verdict for plaintiffs for the full amount sued for.

There are five assignments of error, but the only two urged in the brief are assignments Nos. 1 and 2, which are:

"(1) Said court erred in overruling the motion of plaintiff in error for a new trial.

"(2) Said court erred in refusing to instruct the jury at the close of all the evidence in said cause to return a verdict in favor of the defendant and against the plaintiffs."

At the close of all the evidence, defendant requested the court to instruct the jury to return a verdict for defendant, which was denied. This is the sole error urged. As heretofore stated, plaintiffs did not claim, nor do they now claim, an express contract of employment. They rely wholly upon an implied contract. It is the contention of defendant that the evidence is wholly insufficient to show an implied contract. It is necessary then to examine the entire record in order to determine whether or not there is sufficient evidence to support the verdict.

There were but three witnesses for plaintiff, and there is but little, if any, conflict in the evidence. Plaintiffs' evidence in substance was: That plaintiffs were, and had been for about one year, prior to the transaction here involved, engaged in the real estate business in Norman, with an office located at 211½ East Main street; that defendant was engaged in the grocery business in what was known as the A. & E. Grocery Store, located on Comanche street in the city of Norman; that plaintiffs had known Mr. R. D. Robey for some 15 years or more, and that prior to the transaction Robey and defendant were not acquainted; that a few days prior to October 8, 1925, Robey wrote plaintiffs that he wanted to buy a stock of groceries; that thereafter Robey came to Norman and Ezell told him about the A. & E. Grocery Store, and recommended it to Robey if it could be bought. Robey then directed Ezell to go and see defendant and see if he was willing to sell. Ezell testified:

"I went to see Mr. Kirk, told him we had a buyer for a stock of groceries. I asked him if he wanted to sell it. He first said he didn't want to sell. Then he said, 'I haven't got anything I wouldn't price.' I said, 'If you want to sell it, put a price on it. I think I can sell it.' 'Well,' he says,

'You come back in the afternoon'—that was in the morning—'I'll make you a price.' I come back and he said, 'I made up my mind what it'll take to buy this stock.'. I said, 'What it is?' He said, 'Invoice prices of the stock and $1,500 bonus.' He says, 'I own. that warehouse building, that cost me $250.' I says, 'That means $1,250 bonus on the stock?' He said, 'Yes.' I said, 'I'll put it up to this fellow.' I went over and talked to Mr. Robey. * * * A. I went over, he and I, and Mr. Crowley went back and looked over the stock. Q. That is, you examined the stock of goods? A. Just in the store, looked around. Q. You were looking at the store? A. Yes, sir. Q. Who took Mr. Robey over there? A. Me and him and Mr. Crowley all went together. Q. You invited him over? A. Yes, sir. Q. Went down there for that purpose, look at the stock? A. Yes, sir. Q. What did he do eventually as to buying it? A. Well, we went back— Q. Don't tell what he said, did he buy it? A. Yes, sir, he bought it. Q. What did he pay for it? A. Something over $4,800, I forget the amount, but something over $4,800. Q. We have it alleged here $4,850.94. A. Something near that. I know it was something over $4,800. Q. Do you know whether Mr. Kirk was acquainted with Mr. Robey before you brought Mr. Robey over there to see him? A. No, sir, he was not. Q. You may state whether or not you recommended the purchase of the stock by Mr. Robey to Mr. Robey. A. Yes, sir."

Plaintiff Crowley testified substantially the same as to the facts concerning the transaction, except that he testified that it was customary for real estate brokers to go and see persons who would likely sell their property, get their price and make a sale, and collect a commission on such cases, as well as when the person desiring to sell hunts up the real. estate agent and requests him to sell for him.

On cross-examination, he testified in part:

"Q. You didn't have anything to do with this transaction until after Mr. Ezell had gone around over town here and got prices on grocery stores, so far as Mr. Kirk was concerned? A. So far as Mr. Kirk was concerned—only thing, if he goes out and gets a sale of property, it belongs to me and to him. Q. I'm talking about what you did yourself. A. All right. Q. Did you go into any groceries to see if you could find one for sale? A. Yes, sir; I did. Q. What one? A. I went to O. U. and went to the College grocery. Q. That's two? A. That's two. Q. Did you find them for sale? A. Yes, sir. I could have bought them. Q. Then Mr. Ezell went first to see if a price could be had on Mr. Kirk's store? A. He went down and came and reported this. Q. That's what you understood? A. Yes, sir. Q. Then you went back and Mr. Robey

and Ezell came along with you and looked over the place? A. Yes, sir; we all three looked over the store. Q. Then you obtained till the next day for Mr. Robey to decide? A. I think it was till the next day. Q. Mr. Ezell gave Mr. Robey to decide? A. He had two stores in view. We figured out because we was a good friend to Mr. Robey, that this was the best location down there. Q. Then after the trade was agreed on, the stock was invoiced? A. Yes, sir. Q. Mr. Robey had his representatives at that invoice? A. I was Mr. Robey's representative. Q. Mr. Robey was there? A. Yes, sir. Q. Mr. Ezell there? A. No, sir. Q. What representative did Mr. Kirk have? A. He had Mr. Palmer, he was there, I never knew Mr. Palmer, but he suggested he would act; he understood prices of goods because he bought all his goods from the wholesale grocery. Q. You was representing Mr. Robey, he was also present himself. A. Yes, sir. Q. Mr. Kirk was representing himself, and also he had Mr. Palmer? A. Yes, sir. Q. Then after the transaction was concluded, you spoke to Mr. Kirk about paying you a commission? A. Yes. Q. He told you he hadn't agreed to pay any. A. No. Q. What did he say? A. He said he didn't owe us any commission."

Defendant Kirk testified that he did not know Ezell and Crowley were engaged in the real estate business; that he had known Ezell for sometime; that Ezell had traded some at his store; that he had bought some produce from Ezell and his son. He testified relative to Mr. Ezell coming to see him about the sale of the property and his version of what took place is as follows:

"Q. What did he tell you when he came in there to inquire whether your place was for sale? A. He says, 'Do you want to sell this store?' I says, 'No.' He said, 'You would sell it?' I said, 'Yes, I aint got nothing I wouldn't sell but my wife and kids.' 'Well,' he says, 'I have an old friend and neighbor thats wanting a place. I was trying to help him locate.' He says, 'What will you take, he may buy.' I said, 'I would have to study over it a little bit. I hadn't thought about selling.' I told him to come back in the afternoon, I would give him a price. He come back in the afternoon and asked me what I had to say. I said, 'It will just take to buy this, I've got to have $1,500, for my warehouse, invoice price for my stock and fixtures.' Wanted to know how long I would give to decide over it. I says, 'I'll give you till tomorrow evening, six o'clock.' Q. Was there anything there in Mr. Ezell's statements that intimated to you that he expected, if you sold to the old friend he had in mind, that he was to be paid a commission out of your purchase price? A. No, sir; not a word. I never suspicioned that he wanted— Q. If he had suggested or stated that he did, would you

have made that price what you did? A. No, sir; I would not. By Mr. Grim: Object, incompetent, irrelevant and immaterial. By the Court: Overruled. Exception allowed. By Mr. Luttrell: Q. Was there anything that happened in connection with this transaction up until the time it was closed and the money paid, on the part of Mr. Ezell or Mr. Crowley, was anything said with reference to a commission in case Mr. Robey went ahead and bought the property and paid for it? A. Absolutely not. Q. When did you first learn, Mr. Kirk, that Mr. Crowley and Mr. Ezell were claiming a real estate agent's commission on this sale? A. After the deal was closed, Mr. Robey had paid me for the business, I remember I was coming back from the bank."

In this he was, as to the principal things, corroborated by his son, Clifton Kirk, who worked in the store.

There was considerable testimony bearing on the details of how the trade was actually made, but we think we have set out the substance of all the testimony which would in any way tend to support or show an implied contract of employment between defendant and plaintiffs.

The evidence, we think, clearly shows that the sale was consummated as a result of the efforts of plaintiffs, and would not in fact have been made but for them, but the vital question here to be determined is: Did defendant impliedly employ plaintiffs to make the sale? That is, have the plaintiffs shown facts from which the law will imply a promise on the part of defendant to compensate them for their efforts?

In Ludeman v. English, Executrix, 78 Okla. 177, 189 Pac. 531, this court laid down the following rule:

"A real estate broker's right to remuneration for his services must be predicated on contractual relations existing between himself and the person against whom the alleged right is sought to be enforced. If he is unable to prove an express promise to pay for his services, he must show facts from which the law will imply a promise on the part of the alleged principal to compensate him for his efforts in the transaction in which he claimed to have been employed."

We must then inquire what facts must be shown in actions that the law will imply a promise to compensate for the services rendered. The following general rule is stated in 9 C. J. 556:

"The employment and consequent agreement to pay commissions may also be implied from the circumstances, as where the principal accepts the benefits of the broker's services with the knowledge that he expects to be paid therefor. * * * But a contract of employment and an agreement to pay commissions will not be implied from the mere fact that the owner of property consents to the rendition of services by a broker which result in a sale of the property, especially where the owner had no knowledge that the broker was acting as such before the sale was consummated."

We have carefully examined all the authorities cited by both parties, and the rule most generally accepted is that found in Summa v. Dereskiswicz (Conn.) 74 Atl. 906, as follows:

"A real estate broker seeking to recover commissions for procuring a purchaser of real estate, under an implied contract of employment, must show that he rendered his services under an honest belief, reasonably indicated by the owner's conduct, that a request had been made of him by the owner to render the services, or under such circumstances, in the absence of a request as indicated that he expected to be paid therefor, and that the owner, knowing the circumstances, availed himself of the benefit of the services rendered."

We have carefully examined the evidence, and are unable to find any evidence which in any way tends to prove that plaintiffs could have been acting under an honest belief, reasonably indicated by defendant's conduct, that defendant had requested plaintiffs to procure a purchaser for him. All the evidence of both parties is to the contrary. There is positive proof showing an absence of a request. There is no evidence tending to show that the services were rendered under circumstances that indicated that plaintiffs expected to be paid for the services, and that defendant knowing the circumstances availed himself of the benefits of the services rendered. According to the evidence of both parties not one word was said by any of the parties indicating that plaintiffs expected to be paid for their services until after the sale was consummated. Here again all the evidence of both parties agrees. It is not shown that defendant knew that plaintiffs were engaged in the real estate or brokerage business. But, if he did, this fact alone would not be sufficient to show agency. In 4 R. C. L. p. 299, the following rule is stated:

"While a contract of employment may be implied from subsequent acts of ratification on the part of the alleged principal, to warrant the inference of a previous request, the owner must say or do something tending to prove that he accepted the broker as his agent in the matter—something more than merely selling to the party whom the broker,

while acting as a volunteer, brought to him. Of course, the fact that a vendor accepts the benefits of a broker's efforts does not render him liable to the broker for commissions on the theory of ratification, where he did not know that the broker was working in his behalf, but, on the contrary, the circumstances of the broker's endeavors indicated that he was working in the interest of the purchaser."

The evidence of plaintiffs shows that they were acting for the purchaser rather than the defendant, and clearly shows that defendant was justified in assuming that plaintiffs were so acting and that they did not expect him to pay for the services.

This case presents not a conflict in the evidence, but an entire failure of proof as to the essential elements of an implied contract of employment. If there was any evidence reasonably tending to support the verdict, we would not feel justified in reversing the case, but this being a case coming within the rule that requires a reversal where there is no competent evidence tending to support the verdict, it follows that the trial court committed reversible error in denying defendant's motion for a directed verdict.

The judgment should be reversed, with direction to enter judgment for defendant.

BENNETT, HALL, JEFFREY, and HERR, Commissioners, concur.

By the Court: It is so ordered.