## GYPSY OIL CO. v. McNAIR, Adm'x.

No. 25869.   Dec. 8, 1936.

Rehearing Denied Feb. 9, 1937.

James B. Diggs, William C. Liedtke, Russell G. Lowe, Redmond S. Cole, C. L. Billings, and James B. Diggs, Jr., for plaintiff in error.

B. A. Hamilton and Everett C. Mead, for defendant in error.

PER CURIAM. For convenience, we designate the parties as they appeared in the court below, wherein defendant in error, as plaintiff and as administratrix of the estate of her deceased husband, commenced the action by filing her petition on July 22, 1933, claiming damages against defendant by reason of the death of her husband from alleged heatstroke, or sunstroke. Three causes of action are set out in said petition, but, as the verdict and judgment are based entirely on the first cause, wherein damages in the sum of $37,000 are claimed, the second and third causes and the testimony re'ating exclusively thereto need not be considered.

In plaintiff's first cause of action, the material averments are that her former husband, Clabe McNair, suffered a heatstroke, or sunstroke, on July 13, 1932, at about 9 a. m., while in the employ of defendant as an oil well roustabout, and while engaged in tailing casing at one of defendant's wells in the Seminole oil field designated as "Chippy Coker No. 6;" that as a result of said heatstroke or sunstroke, "decedent wholly collapsed, and was thereafter unable by reason of his collapse * * * to help himself in any manner;" that the weather on said date was extremely hot and the place at which decedent was working was low and situated between two exceedingly steep hills which were heavily timbered, and that contiguous thereto were certain sheet iron buildings and other structures, and that by reason of the location of said well "it was impossible for plaintiff's decedent to get air;" that the superintendent or farm boss of defendant, one Maple Taylor, was present at the time of the collapse of said decedent, and that defendant's roustabout foreman, C. C. Rice, and a number of other employees of defendant working with decedent around the aforesaid well were present at said time; that said decedent, though in a helpless condition caused by said stroke, was given no aid or attention of any kind by Maple Taylor, C. C. Rice, or any other of defendant's employees, for approximately three hours, when said Maple Taylor, while acting for and on behalf of defendant, took decedent, in a helpless condition, from said lease to his home, located about 10 miles away, and

at the time of delivering decedent to his home and into the care of his wife said Maple Taylor told them "he would go and get a doctor;" that thereafter said Maple Taylor immediately left and both decedent and plaintiff waited for a period of approximately seven hours expecting the arrival of a doctor at any moment, but that none came because of the failure of Taylor to carry out said promise, hence that deceased was without any medical aid of any character for a period of approximately 10 hours following his collapse; that decedent had been in the employ of defendant more than eight years previous to said 13th day of July, 1932, and that on said date, in accordance with the custom of defendant and other oil companies operating in that field, defendant furnished transportation to decedent and other of its employees from their homes, or from a certain designated common point near their homes, to their places of work, and at the end of the work day, from such places of work back to their homes or such common designated point; that, according to the common custom or usage of the oil industry in the state of Oklahoma, it was the duty of defendant to furnish transportation for employees who were stricken while employed under the circumstances attending the collapse of decedent, and that such custom and usage was on said date effective and usually followed by defendant at said time, and had been so for a long time prior thereto, especially in cases where such employees were working in the country where they had no means of obtaining assistance or aid for themselves, and that decedent on said occasion had no means of obtaining for himself such assistance or medical aid; that prior to said stroke decedent was a strong, able-bodied man, and but for the negligence of defendant in failing to furnish first aid and medical attention to him immediately after the stroke, as defendant was required to do both by said custom and by the laws of Oklahoma, decedent would have lived for the period of his life expectancy, which was 31.07 years, he being 36 years of age at that time; that prior to the 13th day of July, 1932, decedent was a strong, able-bodied man earning and capable of earning the sum of $125 per month, and that he contributed to the support of plaintiff and their two minor children approximately the sum of $100 per month.

Defendant first filed a motion to require plaintiff to make the fifth paragraph of her petition more definite and certain, by stat-

ing the character of the medical aid obtained, and by whom furnished, at the expiration of the ten hours following deceased's alleged collapse from heatstroke or sunstroke. This motion was sustained, and in compliance with the trial court's order plaintiff filed an amendment to her petition stating that decedent "sought the services of a physician, one Dr. Morrison of Maud, Okla., but that by reason of the ten-hour period of neglect on the part of defendant * * * said Dr. Morrison was unable to benefit plaintiff's decedent by treatment." Defendant also filed a motion to strike certain matters from plaintiff's petition and a demurrer thereto, both of which were overruled.

Thereafter defendant answered by general denial and also interposed certain special defenses to plaintiff's second and third causes of action, but, as the verdict and judgment are based exclusively on the first cause of action, said second and third causes and the defenses thereto are now immaterial.

While the evidence introduced by the respective parties is quite voluminous, it is in real conflict only on two material points: First, as to whether or not Maple Taylor, at the time he delivered decedent to his home, stated that he (Taylor) would go and get a doctor; second, as to the condition of decedent's health for several years immediate'y preceding his alleged stroke on July 13, 1932.

There is practically no dispute as to the character of the weather and the topographic condition at the place where decedent was working at the time he became sick, and, while there is some divergence in the recollection of the various witnesses, there is no real dispute as to the hour at which this occurred.

Plaintiff introduced but two witnesses on these points, i. e., T. J. Hendricks and C. C. Rice. The former testified, in substance, that there was not much circulation of air anywhere on that day because it was pretty hot everywhere; that he was working in the derrick about 30 feet up from the derrick floor, running the stabbing board. As to the time at which Mr. McNair became ill and dropped out of his position, this witness says: "Well, I couldn't say positively, but I believe it was somewhere near 10:30. About 9:30 or 10:00 — somewhere about there." That he saw decedent get into the car with Maple Taylor, who was farm boss of the Gypsy Oil Company. As to the elapsed time between decedent's

becoming ill and leaving with Taylor, witness could make no definite estimate, saying, "It couldn't have been so powerful long, because we went to work on the well, probably at 7:30 and that was about 9:30 or possibly 10 when he took him away." In explaining the character of the location in which decedent was working, this witness says it was down kinda between the two, between the hill and the ravine, or at the edge of the ravine; that the belt hall and the enginehouse were bui't of corrugated iron.

C. C. Rice testified, in substance, that he was roustabout foreman for defendant, and that he, decedent, and other members of a crew were working on the Chippy Coker No. 6 lease on July 13, 1932; that decedent became ill about 9:30 a. m. of that day and went out to the shade of a tree 30 or 40 feet from the well on which he was working, and sat down; that sometime thereafter Maple Taylor, the farm boss, came by and took decedent away in his car. On cross-examination, said witness further testified that about 30 minutes elapsed between the time decedent became sick and the time Taylor took him away; that witness, on learning that McNair was sick, told him to go out and sit down under the shade. Rice further testified that no one was procured to take the place of decedent and that the remainder of the crew continued working on the job the rest of the day.

C. C. Rice was later called as a witness for defendant and testified that his work crew, on July 13, 1932, consisted of himself, Tom Hendricks, Tom Creason, A. B. Tabb, Hershel Lewis and decedent; that Creason was dead; that witness was running the clutch, and then states where and in what capacity the other members were working; that Mr. McNair was "tailing in tubing," that is, holding up the loose end by use of a hook "to keep the threads from dragging;" that McNair was helping to bring the tubing to the derrick floor, which consumed "half, or a little better than half of his time;" that he noticed McNair leave the job several times and asked him what was the matter, to which he replied that the water was not agreeing with him, that he had bowel trouble, and diarrhoea; that there was nothing in McNair's walk or appearance to indicate that he was in a serious condition, or that "he was any hotter than the rest of the men on the job." Witness then described the topography of the district immediately surrounding the well at which he, McNair, and the others were working, showing same to be located near

the foot of a small hill on sloping ground and partially surrounded by timber and other hills.

H. G. Harper was next called as a witness for defendant and identified a plat and photograph showing the topographic features of the place in which said well was located (R. 263-6) and that the derrick floor is 20 feet lower than the top of the nearest hill.

The testimony of Rice as to the apparent condition of decedent at the time he quit work on account of being sick, the kind of work he was performing, and his statements as to the cause of his sickness, is corroborated by the testimony of Hershel Lewis and A. B. Tabb, other members of the work crew.

Lewis further testified that decedent quit work on account of sickness at about 9:30 that morning and that Taylor, farm boss, took him away about 30, not over 50, minutes later.

Tabb further testified that decedent "was around there, stirring around and going first one place and then another; for a little bit," but said nothing about wanting a doctor; that he saw decedent "go out there to the car and Taylor was busy at something right then and he stood there a few minutes, and I went on about my business;" that it was not over 30 minutes after he learned that decedent was sick until he went away with Taylor.

Defendant next introduced Maple Taylor, who testified that he was production foreman for defendant in the Mission district of the West Seminole field; that on July 13, McNair was working at the C. Coker No. 6 well; that after visiting several other points in said district on that morning, he drove up to within a few feet of said we'l, went down to the derrick, and C. C. Rice told him "McNair is sick, he is out in the shade;" that the first time he saw McNair, he was walking towards the car; that McNair told witness he was sick, whereupon they both got into the car and drove to McNair's home, between 3½ and 4 miles away; that he saw nothing in McNair's appearance at that time or on the way to his home to indicate that he was suffering any particular pain; that McNair said to witness. "I don't know what is the matter. with me, I guess it is the water;" that a short distance from the well witness asked McNair if he wanted to go to a doctor and the latter said he did not; that "he told me he had taken medicine then and had medicine—

he said 'probably all the doctor would give me';" that "just before we got to where I turned off to go down to his house— probably three-quarters or half a mile on the main Seminole road—I stopped my car and talked to Shorty, and I says, 'You ought to let me take you in to a doctor. I will take you in to our company doctor, or any other you want to go to.';" that in response to this, McNair said, "I have got some medicine that I am taking;" that he stopped the car between 60 and 70 feet from the front door of McNair's home and when the latter got out and walked a little distance witness said to him, "You forgot your lunch pail," and thereupon McNair went back to the car and got his dinner bucket, and then went to and entered the front door of his home; that, so far as he could tel', there was nothing in McNair's walk at that time which indicated he was in a serious or unusual condition.

Except as to the distance between the point where Taylor stopped his car and the front of McNair's home, the foregoing testimony is not controverted by that of any other witness or by any physical fact or surrounding circumstance, nor is it otherwise discredited except by the showing that all of its witnesses were employees of defendant on July 13, 1932, and at the time of the trial. In fact, the testimony above set out is corroborated by that of A. B. Tabb, W. C. Chambers, Charles Robinson, William Tabor, and H. M. Webster (also emp'oyees of defendant) to the effect that Mr. McNair, while working at the No. 6 Coker well on the afternoon of June 30, 1932, got sick, lay down in the shade, and vomited.

The testimony of the parties who were with decedent at the time he became ill on the morning of July 13, 1932, is further corroborated by that of Dr. D. D. Mosher of Seminole, Okla., who examined him that same afternoon. Dr. Mosher testified that decedent, in giving a history of his previous physical condition, made no mention of his having suffered a sunstroke while working at said well that morning, or of having thereafter been unconscious at his home, but stated that "he had been feeling bad for some time and had lost quite a bit of weight. * * * He said he was kind of short of breath, I be'ieve." Dr. Mosher further states that, upon his examination of decedent, he found his temperature ran 99 to 100, or a little over; that he "appeared to have what we call a respiratory infection, some-thing like the flu," and that "on the 20th,

he weighed 135 pounds" with his clothes; that he treated decedent the last time on July 29th for this chest condition.

Furthermore, Dr. O. B. Coppedge of Depew, Okla., testified that he treated bo'h Clabe McNair and his wife during 1931, and that decedent "had what we call high blood pressure and coronary heart disease," and had hardening of the arteries or arterio sclerosis, and at that time his condition was serious, that he saw decedent lots of times, but treated him only two, three, or four times; that decedent "had a condition that was impossible to recover from;" that it was always fatal and that the "only question is the question of time"; that his blood pressure "run around two hundred."

The testimony of said parties is corroborated further by the letter prepared by I. A. Barr, also an employee of defendant, addressed to J. D. Iams, Tulsa, Okla., another employee of defendant, signed by decedent on July 22, 1932, reading in part as follows:

"I had been working out of doors for the week preceding July 13, 1932, roustabouting, doing in general the same work that I was doing when taken ill on July 13th. I had felt a little bad for several days before the 13th, but kept working. The doctor, Dr. Moser, told me he thought I. had the flu, and it is my belief I had a light case of flu. I first began to feel pretty bad about 10 a. m. 13th and quit work about 11 a. m. I began to get sick at my stomach and dizzy, and felt shaky and faint. Previous to 10 a. m. had not felt exactly right, but was able to work without discomfort. When I first noticed illness, I began to get weak. Did not have headache, cramps, chills, but at 1:00 p. m. when I went to the doctor had 101 deg. temperature. Have stated previously in this letter that I was sick at my stomach, but not to any extent, it was more a feeling of weakness. Did not have any pain in any particular part of my body, but just felt tired. Did. not lose consciousness at any time."

As disclosed by the record, the Dr. Morrison of Maud, Okla., whose services. as alleged in the amendment to plaintiff's petition, were first obtained after the collapse of her husband, was not called as a witness either by plaintiff or by defendant.

It is admitted that decedent re-entered the employ of defendant on August 22nd and worked continuously until December 12, 1932, when he had to lay off on account of ill health,- and that he died suddenly, apparently from heart failure, on February 28, 1933. ·

Testimony on behalf of p'aintiff tending

to controvert or disparage the statements contained in the letter to Iams dated July 22, 1932, the testimony given by Dr. Coppedge and by the parties working with deceased on June 30, 1932, is that of plaintiff, John McNair, father of deceased, Preston Smith, and C. D. Smith, brothers of plaintiff, Nicholas Lundy, and A. W. Shipman, to the effect that they had been well acquainted with deceased either all of his life or for long periods of time prior to July, 1932, and to their knowledge he had been an industrious, hard-working, ablebodied man, and to all appearances enjoying good health prior to his illness on the 13th day of that month.

Plaintiff testified in part that decedent was 37 years old, and prior to July 13, 1932, was earning $115 a month; that he used his earnings to support his family, had good habits and. prior to said date had lost only one week from work, this in 1924; that he enjoyed good health, weighed 145 or 150 pounds, and lost a little weight in 1929; that he was treated by Dr. Coppedge, took medicine prescribed for about two weeks, and got all right; that he was a strong man with a steady nerve, and she never noticed his having difficulty in breathing; that he was not mentally affected, but seemed nervous after his July 13th illness; that about 5 p. m. of that day, her brother came and she took decedent to a doctor and, on cross-examination, that he went with her brother to Seminole to see Dr. Mosier (Mosher), and that he walked to the car in which he was taken thereto. She further testified on direct examination that Maple Taylor brought deceased home about 11:30 that morning and drove up about ten feet from the front door, "Let my husband get out," saying, "I will get a doctor;" that deceased "wobbled as he walked," and "came in the house, walked through the front room and got as far as the dining room and fell on the floor;" that he suffered with headaches and fever several weeks thereafter.

As already indicated, deceased's father, plaintiff's two brothers, and the other two witnesses above named, in more or less degree, corroborated her testimony as to the previous condition of decedent's health and his ability to perform manual labor, but, as before stated, the testimony of C. C. Rice and other members of his work crew as to the actions, statements, and appearance of decedent, following his becoming ill at said Coker No. 6 well on the morning of July 13, 1932, stands undisputed.

Physicans called by the respective parties —three for plaintiff and two for defendant —to testify as medical experts, differed rather widely in their opinion as to the causes of deceased's affliction, but these opinions were based either solely on hypothetical questions or on physical examinations of deceased, accompanied by a history of his previous condition, made in January or February, 1933, and after he had filed with the State Industrial Commission (on January 9, 1933) a claim for compensation. However, by reason of the view we take as to the legal principles applicable to certain portions of the undisputed evidence, it will not be necessary for us to consider the probative effect of said expert testimony.

The rule of law applicable to such a situation is well settled and is concisely stated by the Circuit Court of Appeals for the Fifth Circuit, in Arnall Mills v. Smallwood, 68 F. (2d) 57, holding in part that:

"Witness' employment by or relationship to party for whom he testifies may be considered on question of his credibility, but is not alone sufficient reason for disregarding his testimony."

The following excerpts from the opinion, which are supported by numerous authorities, clearly illustrate the scope and character of the rule:

"The uncontradicted, unimpeached, and not incredible testimony of these three witnesses demands a finding that there was nothing wrong with the box or its alignment and that it was not left in a dangerous state that morning. * * *

"Their testimony is candid, clear, and reasonable, and unopposed by other witnesses or by circumstances which are irreconcilable with it. They are not impeached by any of the modes known to the law. Their evidence cannot be disregarded just because they are employees of the mill. * * *

"Employment or other relationship of a witness may be considered on the point of his credibility in weighing his against opposing evidence, but is not by itself a sufficient reason for disregarding his testimony."

In Georgia Railroad & Banking Co. v. Wall (Ga.) 7 S. E. 639, it is held that:

"When the killing of stock by a locomotive is fully explained by uncontradicted testimony, though of employees only, that the accident took place before daylight, in a fog so dense as to prevent the animals being seen in time to save them, with which the circumstances do not disagree, the presumption of negligence arising from the accident is rebutted, such evidence, if not discredited, being entitled to respect, and a verdict for plaintiff should be set aside."

See, also, Western & A. R. Co. v. Beason (Ga.) 37 S. E. 863; Western Union Telegraph Co. v. Mason (Ky.) 22 S. W. (2d) 602; Brannen v. State (Fla.) 114 So. 429; Chesapeake & O. R. Co. v. Martin, 283 U. S. 209, 75 L. Ed. 983.

In Cheasapeake & O. R. Co. v. Martin, supra, it is held that:

"The rule that the question of the credibility of witnesses is one for the jury alone does not mean that the jury is at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt."

In Brannen v. State, supra, the court holds that:

"Ordinarily, and subject to certain well-defined exceptions, uncontroverted and undiscredited evidence, when material, properly admitted, and when it consists of facts (not opinions), cannot be wholly disregarded or arbitrarily rejected, even though the witness giving it is an interested party.

"While conflicts in the evidence, the credibility of witnesses, and the weight of the evidence are for the determination of the jury, still the legal effect of material and competent evidence, not met by opposing evidence, and not impeached, discredited, or controverted, is a question of law."

The rule has been recognized repeatedly by this court; White v. U. S. Fidelity & Guaranty Co., 158 Okla. 296, 13 P. (2d) 186; Kirk v. Ezell, 136 Okla. 290, 277 P. 939.

In the opinion of this court in Davis v. Wallace, 169 Okla. 497, 37 P. (2d) 602, it is said:

"The court may consider also undisputed testimony favorable to the defendant, brought out in the presentation of plaintiff's case when passing upon the demurrer of defendant to the evidence of the plaintiff," citing Carter Oil Co. v. Independent Torpedo Co., 107 Okla. 209, 232 P. 419, and quoting from the opinion on page 423.

In Littlefield v. Lawrence, 82 N. Y. S. 25, it is held in part that:

"While the credibility of every witness is usually for the jury, they are not at liberty to disregard the testimony of any witness, even though he be a party, who is in no wise impeached, and whose testimony is such that its truth is highly probable." Lomer v. Meeker, 25 N. Y. 361; Kelly v. Burroughs (N. Y.) 6 N. E. 109; Boudeman v. Arnold (Mich.) 166 N. W. 985, 8 A. L.

R. 789; Jerke v. Delmont State Bank (S. D.) 223 N. W. 585, 72 A. L. R. 7.

In the above-cited case of Carter Oil Co. v. Independent Torpedo Co., supra, it is held:

"Neither conjecture nor speculation forms a reasonable basis for arriving at a verdict in a case where recovery is sought upon the alleged negligence of the defendant, but there must be evidence reasonably tending to show that defendant was guilty of some one of the negligent acts charged and that such negligence was the proximate cause of the injury."

One of the negligent acts charged against defendant in the instant case is that its roustabout foreman and farm boss failed to procure for Clabe McNair needed medical aid on the morning of July 13, 1932, when he observed, or in the exercise of reasonable diligence should have observed, that he had suffered a heatstroke or sunstroke, and, as a consequence, was in a serious and helpless condition. Plaintiff further avers that, as a result of such neglect for a period of 9 or 10 hours, decedent's health was permanently impaired, causing his death on February 28, 1933.

The record discloses that defendant demurred to plaintiff's evidence, and after the close of all the evidence requested the court to give to the jury a peremptory instruction in its favor, that both said demurrer and request were refused and exceptions reserved. It is a well-settled general rule that, in the absence of a contractual obligation, the master is not bound to provide medical aid for a sick or injured employee. Baker v. Whitten, 1 Okla. 160, 30 P. 491; Roff Oil & Cotton Co. v. King, 46 Okla. 31, 148 P. 90; Sevier v. Birmingham S. & T. R. R. Co., 92 Ala. 258, 9 So. 405; Carey v. Davis, 190 Iowa, 720, 180 N. W. 889, 12 A. L. R. 904.

That part of instruction No. 5 given by the court and excepted to by defendant reads as follows:

"You are instructed that if you find and believe from a preponderance of the evidence in this case that Clabe McNair, the deceased, while working upon the oil lease of the defendant suffered a heatstroke or sunstroke, and was thereby rendered incapable of caring for himself, and the defendant knew such a fact through its agents and servants present at the time, then it became the duty of the defendant, through its agents and servants who were present, to exercise reasonable diligence in giving to the said Clabe McNair first-aid and in procuring for him medical aid and attention, and if you find that the defendant failed to perform this duty, and you further find that as a direct and proximate result thereof the plaintiff's decedent subsequently died, then and in that event the defendant would be liable, and your verdict should be for the plaintiff."

This instruction lays down the correct rule for cases wherein there is evidence fairly tending to support each of the different elements thereof, but, as already seen, plaintiff introduced no testimony fairly tending to show that the agents or servants of defendant present at the time referred to knew, or by the exercise of due care would have known, that deceased was suffering from sunstroke, and consequently in urgent need of immediate medical aid. On the contrary, the undisputed testimony of all said agents or servants is to the effect that they noticed nothing in the actions, statements or appearance of deceased at that time to indicate that he was suffering severe pain or was in a serious condition.

The question of whether or not an admitted or clearly established state of facts does, or does not, show that a sick or injured employee is in such a serious condition as to cast upon the employer the duty of furnishing him prompt medical treatment, is also one of law for the court's determination. To bring a case within the rule casting such duty upon the master, it must be shown, or there must be evidence fairly tending to show, that the stricken employee will suffer loss of life or serious bodily harm unless such aid is provided, and that the employer or his agent actually had, or by the exercise or due care would have had, notice thereof.

That such is the prevailing rule is shown by most, if not all, of the authorities cited by counsel for plaintiff to this point. For instance, in Troutman's Adm'x v. Louisville & N. R. Co. (Ky.) 200 S. W. 488, wherein the master was held liable, the facts briefly stated in the opinion are the following:

"Archie Troutman, while in the employ of the defendant railroad company as a foreman of track repair men, in attempting to board a moving freight train for the purpose of going to a place on the track where his attention was needed, was thrown under the caboose, the wheels of which ran over his legs, virtually severing both of them from his body, and from the effects of the injuries so received he died a few hours afterwards."

In Hunicke v. Meramec Quarry Co., 172 S. W. 43, twice decided by the Supreme Court of Missouri, it is held that:

"Where a servant was so grievously hurt that he was in great danger of bleeding to death and could not assist himself, the master was bound to furnish medical aid and was liable for the death of the servant, where it neglected for so long a time to procure medical aid that the servant bled to death."

The facts therein, except as to "some conflict among the opinions of expert witnesses," are undisputed, and show that deceased was 22 years old, weighed about 165 pounds, was healthy and robust, and

"That he was employed in the quarry of the defendant on March 12, 1909, at Wicks, the time when he sustained the injuries mentioned. The injuries mentioned were caused by a car running over him, belonging to the St. Louis & Iron Mountain Railway Company, while moving on a spur track in the defendant's premises. That the injuries were most grievous, his right leg was severely crushed, lacerated at a point from four to seven inches below the hip joint. The fractured bone punctured a hole about the size of a silver dollar in the fleshy part of the limb, through which great quantities of blood were freely flowing at the time assistance reached him, which was almost simultaneous with the reception of the injury."

Then follows a detail of facts showing the grossest sort of neglect by defendant's superintendent, and closes with the following statements:

"During the entire time from the instant of the injury down to the time the bandage was placed on his leg in the hospital, four or five hours later, the blood never ceased to flow from this ugly, gaping wound, and when the amputation took place his body was practically bloodless and lifeless, though he was still rational. That a few hours thereafter he breathed his last."

The same case on second appeal is reported in 189 S. W. 1167.

Many additional cases of similar import are cited in the briefs of the respective parties and same could be multiplied ad libitum.

The first paragraph of instruction No. 4 given by the court and excepted to by defendant reads as follows:

"You are instructed that the plaintiff in this case cannot complain of any failure of the defendant to procure medical aid for Clabe McNair even though he was in urgent need of such medical aid if the defendant, through its farm boss, Maple Taylor, offered to procure a physician for the said Clabe McNair, and he, the said Clabe McNair, refused such offer, if at the time of the refusal the said Clabe McNair was conscious and knew what he was doing, or the defendant, through its farm boss, Maple Taylor, thought that the said Clabe McNair was conscious and knew what he was doing."

There is no evidence showing, or fairly tending to show, that deceased became unconscious at any time before he entered his home and walked to the middle room thereof, where Mrs. McNair says he fell apparently unconscious and remained so for several hours. Bearing in mind the established rule that the undisputed and unimpeached testimony of Mr. Taylor, as to the actions, statements, and appearance of deceased during the time he was being taken from the well to his home, and as to Taylor's offer to take him to see a doctor and his refusal thereof, must be taken as true, it is evident that the trial court erred in submitting to the jury the issues of whether or not such offer was made and refused, and of whether or not "at the time of the refusal the said Clabe McNair was conscious and knew what he was doing, or the defendant, through its farm boss, Maple Taylor, thought that the said Clabe McNair was conscious and knew what he was doing."

In view of our conclusion on the foregoing questions, it is not necessary that we determine the other controverted issues. However, we deem it advisable to consider instruction No. 6, wherein the trial court submitted to the jury the question as to whether or not the defendant, "through its farm boss, Maple Taylor, assumed the care of Clabe McNair after he became sick," was duly excepted to by defendant. It having already been found by undisputed testimony not in conflict with any attending circumstances, that Clabe McNair was not in such a condition as placed a duty on the company to furnish him medical attention, the instruction was erroneous. The disputed testimony of the wife that Taylor had stated, after he had taken McNair to his home and delivered him into her custody, "I will go get a doctor," would not make the instruction proper, as the duty of the company to furnish medical attention is limited to the time that the employee is helpless, and is not attended by someone, other than a co-employee, whose duty it is to care for him, and therefore such offer by Taylor after McNair had been returned to his home and his wife was not within the scope of Taylor's employment. But, assuming that he had such authority, still said statement, in our opinion, did not con-

stitute the assumption by defendant of the care of deceased. It certainly did not amount to an agreement to perform such services.

As showing the character of acts which suffice to prove the assumption of such care by the master, see Baker v. Adkins (Tex. Civ. App.) 278 S. W. 272; Tullgren, Adm'r v. Amoskeag Mfg. Co. (N. H.) 133 Atl. 4, 46 A. L. R. 380; Carey v. Davis, supra. From the rule therein announced, it is seen that, to constitute such assumption, some more affirmative action in the way of taking control of the sick employee is required than the mere statement of the master's agent, when delivering such employee into the custody of his wife, that he would "go get a doctor."

For the reasons stated, the judgment of the trial court is reversed and the cause is remanded, with directions to dismiss plaintiff's petition and enter judgment for defendant.

The Supreme Court acknowledges the aid of Attorneys J. R. Keaton, W. A. Lybrand, and Eugene Jordan in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Keaton and approved by Mr. Lybrand and Mr. Jordan, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, this opinion was adopted.

McNEILL, C. J., OSBORN, V. C. J., and RILEY, BUSBY, and PHELPS, JJ., concur.