339 P.2d 731

**SOUTHERN PACIFIC COMPANY, a corporation, Appellant,**

v.

**Clotilda A. HENDRICKS, Administratrix of the Estate of Alexander Joseph Augustin, Appellee.**

No. 6361.

Supreme Court of Arizona.

May 27, 1959.

Rehearing Denied July 7, 1959.

Boyle, Bilby, Thompson & Shoenhair, Tucson, for appellant.

Marquez & Wine and Lowell E. Rothschild, Tucson, for appellee.

UDALL, Justice.

This is an appeal by defendant, Southern Pacific Company, a corporation, from a judgment, based upon a jury verdict, in favor of plaintiff-appellee, Clotilda A. Hendricks, administratrix of the estate of her son, Alexander Joseph Augustin, deceased, for his alleged wrongful death by sunstroke due to the claimed negligence of defendant. We shall hereafter refer to the parties by name or as plaintiff's decedent, and defendant.

■ The action was brought under the provisions of the Federal Employers' Liability Act, Title 45 U.S.C.A. § 51 et seq. The statute expressly imposes liability upon the employer to pay damages for injury or death due "in whole or in part * * * to its negligence." Inasmuch as this section does not define negligence, we are not unmindful of the holdings of the Supreme Court of the United States, that the question as to what constitutes negligence is controlled by common-law principles and that federal decisional law formulating and applying the concept governs.

The complaint in the instant case alleged, inter alia,

"That while engaged in said duties as a track maintenance laborer, plaintiff's decedent became violently sick due to the extreme heat and the conditions under which he was working; and that by reason thereof said *decedent was powerless to help and care for himself;* that the physical condition of the decedent arose in the presence of and was made known to * * foreman of the crew of which the deceased was a member; that the defendant corporation's officer, *agent and servant knew or should have known full well the condition of the decedent and said decedent's need for assistance and medical attention.*

"That it was the duty of the defendant under the circumstances heretofore alleged to give and provide the decedent immediate attention, first aid and medical care; that the defendant negligently failed to provide said decedent with immediate assistance, first aid and medical care; * * * that as a proximate result of the defendant's failure to exercise ordinary care in the emergency, and its breach of duty as provided by law and as above set forth, the death of the decedent occurred." (Emphasis supplied.)

Defendant's answer, while admitting that decedent became ill while at work, makes a general denial as to the above averments, and in addition alleged that decedent's illness and death were solely or partially caused by his own negligence.

At the close of plaintiff's case, and again at the close of all the evidence, the defendant moved for a directed verdict upon the ground that there was no evidence, or inferences properly deducible therefrom, from which the jury could properly find that defendant breached any duty which it owed decedent, or which in whole or in part proximately caused his death. Both motions for an instructed verdict were denied and the case was submitted to the jury which returned a verdict for plaintiff in the sum of $13,500. This appeal followed. While there are several assignments of error, some of which complain of the giving of certain instructions as well as the refusal of the court to grant judgment n. o. v.

and/or a motion for new trial, the vital issue, which we believe is determinative of this appeal, is the sufficiency of the evidence for submission to the jury.

■ To solve the problem presented we must first necessarily determine what duty a railroad company owes its employees with respect to furnishing them with medical aid and assistance. The governing principles of law are not in dispute. It is the general rule that in the absence of either a contractual or statutory obligation an employer is not legally bound to render medical assistance or aid to an employee who, while on the job, becomes ill or suffers injury without the employer's fault. Exceptions to the general rule are: (1) when an employee, to the employer's knowledge, becomes so seriously ill while at work as to render him helpless to obtain medical aid or assistance for himself, the employer must exercise reasonable care to procure medical aid and assistance for such helpless employee; and (2) when an employer actually undertakes to furnish aid or assistance to an ill employee, he must exercise reasonable care in rendering such aid and assistance. See, 35 Am.Jur., Master and Servant, sections 108 and 109; Szabo v. Pennsylvania R. Co., 132 N.J.L. 331, 40 A.2d 562, 563; Carey v. Davis, 190 Iowa 720, 180 N.W. 889, 12 A.L.R. 904. Furthermore, relative to the exceptions, supra, the duty arises out of strict necessity and urgent exigency. It arises with the emergency and expires with it. Szabo v. Pennsylvania R. Co., supra.

This rule and its exceptions are applicable to actions brought under the provisions of the F.E.L.A. statute. See, Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368; Lanni v. Wyer, 2 Cir., 219 F.2d 701.

Admittedly there is neither a contractual nor statutory obligation to be considered in the present case. The case was tried to the jury on the theory that the first exception to the general rule, supra, applied, i. e., that if while at work an employee becomes so seriously ill as to render him helpless, the employer, having knowledge of such condition, must exercise reasonable care to procure medical aid or assistance for him.

■ In relating the facts we shall, wherever there is a conflict, necessarily state them in a light most favorable to a sustaining of the judgment. The transcript shows that in the month of July 1955 defendant was re-laying some of the railroad tracks in and near its Gila Bend yards. An extra section gang, with Neville Jantz as general foreman, was doing the work. On July 26, 1955, the plaintiff's decedent, Alexander Joseph Augustin, and his friend, Raymond Thomas Valentine (both of whom were Indian boys residing at Ajo, a town 42 miles distant), came to Gila Bend and applied for and were given jobs as section

hands with the Southern Pacific. Augustin was a single man, 21 years of age; a high school graduate and with some prior experience as a railroad worker. In connection with a written application for employment he gave his past medical history which indicated he was then in good health and had never had any serious illness. Both boys went to work for defendant the next morning with the extra gang under Foreman Jantz, working from 7:00 a. m. to 3 p. m. No untoward incident occurred that day. They were furnished "quarters" in outfit cars stationed at the west end of the Gila Bend railroad yards. The next morning Augustin reported for work at 7:00 a. m. (the men walking from their quarters to the work, which took approximately twenty minutes). This day the two Indian boys were separated, working under different subforemen. The crew Augustin was with were engaged in pulling the spikes and removing "tie-plates" from the tracks and throwing the tie-plates—weighing approximately 8 pounds each—off to one side of the railway right of way. A co-laborer, Alexander Trujillo, testifying for the plaintiff, stated that the latter, against his advice, drank lots of water and refused salt tablets carried by the water boy. During the course of the morning (about 10 a. m.), Augustin became sick at his stomach and vomited. A subforeman named Flores told him to sit down over in the shade of one of the box cars, which he did, staying there

for some 20 or 30 minutes; he then came back to work and worked up until lunch time. Plaintiff's witnesses, Trujillo and Valentine, were with Augustin at lunch time and both testified that he then looked all right to them, and after lunch he returned to work with the other men. At about 2:30 p. m. Augustin complained to Trujillo that he did not feel well. He then approached an assistant foreman by the name of Frank and we quote from the testimony of Trujillo as to what transpired:

"Q. And he asked Frank if he could take off and go back to camp and Frank said, 'Well, you have to ask the boss.' A. Yes.

"Q. So then he walked on down toward the depot and the boss was right down there near the depot, that was Mr. Jantz, wasn't it? A. Yes.

"Q. He ask Mr. Jantz he said, 'I'm not feeling so good can I go back to camp?' A. Yes.

"Q. And Mr. Jantz said, 'All right if you're not feeling good go on back to camp.' A. That's right.

"Q. You told Jantz that you (Trujillo) were going back to camp too?

A. That's right."

Trujillo further testified that at the time Augustin went over to Jantz he was "a little shaky and pale"; however, this was denied by Jantz.

The conversation between Jantz and Augustin took place just a little east of the depot at Gila Bend. The foreman told the latter to "go tell the timekeeper, * * * and he could take off." It appears that the timekeeper was then at the depot. Thereafter the two men (Augustin and Trujillo) left together, walking toward their quarters. It appears that near there a train was on one of the tracks and Trujillo went on the south side of it and Augustin continued on the north side, and that was the last that he was seen alive by anyone.

After the day's work was done and the section crew were returning to their quarters the body of Augustin was discovered by them at about 4 p. m. It was lying off the embankment in the sun, just to the north of the railroad tracks, which point was within about 300 yards of their sleeping cars. The highway patrolman estimated the distance from the depot to decedent's body as being about one-half mile. Augustin was taken to the office of Dr. Bogel J. Jeffrey (which is sometimes referred to in the testimony as the hospital), where the doctor pronounced him dead and stated that the body was dry and recorded a temperature reading above 108 degrees, which was as high as his thermometer registered. The doctor diagnosed the cause of death as "Thermic fever" (commonly known as sunstroke).

It is well known that Gila Bend is one of the hottest places in the United States and the evidence shows the thermometer registered as high as 105 degrees Fahrenheit on the day in question. It being the rainy season period, it was sultry and the humidity higher than normal though no witness gave figures thereon. While the resident doctor was not unfamiliar with sunstroke cases—which usually occurred to those unacclimated—there is no evidence in the record that any such cases had theretofore arisen with any of defendant's employees.

It might be well to note that both of the medical witnesses made it clear that there is a vast difference between "heat exhaustion" and "sunstroke", though both are caused by the same thing, i. e., "excessive environmental heat." We quote from Dr. Jeffrey:

"Q. Doctor, what is the difference between—if there is a difference between heat exhaustion and sunstroke?

"A. Well, other than the fact that probably the causes that bring it about are the same—that is, as near as they ever get together, because as far as I am concerned they are absolutely in reverse of one another. There are two conditions.

"Q. I wonder if you can elaborate a little bit more, Doctor?

"A. Well, let's say that the temperature of the case of sunstroke was 108°; whereas, your case of heat exhaustion usually is opposite. They are sub-nor-

mal, below normal, and whereas in your case of sunstroke the patient is very extremely dry and extremely hot, why your case of heat exhaustion the patient is very wet and very sweaty."

From the foregoing facts can it be fairly charged the foreman knew, or should have known, that Augustin was (as alleged in the complaint) *violently sick and powerless to help and care for himself?* Is there in this record any evidence of defendant's negligence which should have been submitted to the jury, or did it present a question of law for the court to decide? The recognized test to apply was laid down in the sunstroke case of Gypsy Oil Co. v. McNair, 179 Okl. 182, 64 P.2d 885, 892, viz.:

"The question of whether or not an admitted or clearly established state of facts does, or does not, show that a sick or injured employee is in such a serious condition as to cast upon the employer the duty of furnishing him prompt medical treatment, *is also one of law for the court's determination.* To bring a case within the rule casting such duty upon the master, it must be shown, or there must be evidence fairly tending to show, that the stricken employee will suffer loss of life or serious bodily harm unless such aid is provided and that the employer or his agent actually had, or by the exercise of due care would have had, notice thereof." (Emphasis supplied.)

This governing principle of law was quoted with approval in the recent sunstroke case of Rival v. Atchison, Topeka & Santa Fe Ry. Co., 62 N.M. 159, 306 P.2d 648, 64 A.L.R.2d 1098, so strongly relied upon by the plaintiff. Incidentally, the facts in that case were entirely dissimilar than in the instant case, as there the afflicted man was flailing his arms and legs, having lost all of his body motivation and was obviously in dire need of medical attention which was not promptly furnished to him by the defendant railroad company. The case was correctly decided. For a similar situation, cf. Szabo v. Pennsylvania R. Co., supra.

In analyzing the facts in the instant case, they must be considered in the light as they would have appeared to an ordinarily prudent man standing then in the shoes of the foreman. Hindsight should play no part in it and it must also be recognized that the foreman was not a doctor but only a layman. The evidence does not show that Augustin at the time of his becoming ill was incapable of caring for himself or incapable of requesting assistance. He did not fall to the ground or become unable to walk or talk. The record shows decedent knew where the hospital was and his route back to quarters took him within close proximity thereto. Doctor Jeffrey testified that the first symptoms one would expect to observe in a person who was in the process of having a heat stroke (this being a paralysis of the heat centers of the body) would be to faint

or lose consciousness or inability to maintain one's sense of equilibrium, as well as mental confusion. Co-laborer Trujillo, the last man to see decedent alive, testified that Augustin was able to stand erect and walk all right, with no staggering or dizziness apparent; that he could and did talk all right and furthermore did not ask anyone for help; that he was sweating profusely (a symptom of heat exhaustion, not sunstroke). Also, these questions and answers appear:

"Q. * * * At any time from the time you and Augustin left Jantz, until the time that you split up, one on either side of this train, did he do anything at all that made you think that you ought to take the man to the hospital?

"A. No.

"Q. Did he do anything at all that made you think that he was real sick?

"A. No."

We believe it can be said, as a matter of law, that from this record the foreman did what an ordinarily prudent man would have under the circumstances and did not fail to do anything which the same ordinarily prudent person would have done under such circumstances, hence there was no breach of duty. It is, therefore, our considered opinion the trial court erred in submitting the case to the jury as there was no evidence of actionable negligence shown, or any that could be inferred on the part of defendant's agent. See, Bowers v. J. D. Halstead Lumber Co., 28 Ariz. 122, 236 P. 124.

Judgment reversed with directions to dismiss plaintiff's complaint.

M. T. PHELPS, C. J., and BERNSTEIN, J., concur.

STRUCKMEYER, Justice and FARLEY, Superior Judge (dissenting).

The Honorable Gordon Farley and I view this case in a different light than our colleagues. As a predicate we assume that even when the facts are undisputed, if uncertainty arises because fair-minded men may honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury. Best v. District of Columbia, 291 U.S. 411, 54 S.Ct. 487, 78 L.Ed. 882; Figueroa v. Majors, 85 Ariz. 345, 338 P.2d 803.

The incident complained of occurred in summer at Gila Bend, Arizona, a small community located in the heart of the southwestern desert.[1] Heat stroke occurs in the presence of high environmental heat under

1. Dr. Bogel J. Jeffrey testified:
"* * * the only claim to fame that we have at Gila Bend is that we top the nation about three days out of five throughout five months of the year.

"Q. Do you mean so far as the heat is concerned? A. Yes, that's all. That is heat, that is all that I am talking about."

conditions of exertion.[2]  One who is unaccustomed to working in the presence of high environmental heat is more likely to suffer heat stroke than a person who is used to it.[3] Augustin had been living in California. About 10 a. m., July 28, 1955, on the second day of employment, he became sick and, although obviously sick to his fellow-employees, continued on the job for a period of nearly five hours before seeking permission to leave.[4]  He was then pale and shaking.[5]  However, the foreman made no effort to ascertain the extent of his illness,[6] but directed him to check in with the time-

2. Dr. Nathan S. Kolins, a specialist in internal medicine, testified:

"Q. Now, Doctor, I wonder if you would give the Court and the jury an explanation of what can or what does bring about heat stroke in the usual case? A. Well, heat stroke is a relatively unusual condition. It occurs in the presence of high environmental heat, under conditions of a good deal of exertion on the part of the patient."

Dr. Jeffrey testified:

"Q. Doctor, what are the conditions that will lead to a person suffering an attack of sun stroke? A. Well, the outside climate would probably be the number 1 cause, and your number 2 cause would possibly be hard work or over-extension of work, and number 3, the general health of your patient, or your general health of the person that died, let's say."

3. Dr. Nathan Kolins testified:

"Q. * * * In other words, a person who is used to working in that kind of heat and doing that kind of labor is not as likely to suffer heat stroke as a person who is not used to that, is that correct? A. That is right."

4. A fellow-employee, Trujillo, testified:

"Q. Now do you know whether or not Augustine had been sick during the day? A. Yes, in the morning.

"Q. What had been wrong with him? A. He was vomiting and some kind of shaking cramps was what he told me.

*    *    *    *    *

"Q. So along in the morning he became sick at his stomach? A. Yes.

"Q. And he went over and vomited? A. Yes.

"Q. Then he sat down, the foreman told him to sit down over in the shade of one of those boxcars on one of those tracks, didn't he? A. Yes.

"Q. And he sat down over there— A. He didn't stay very long.

*    *    *    *    *

"Q. * * * Just about, he sat down there about 20 minutes and on his own he came back to work, didn't he? A. Yes.

"Q. Then he worked up until lunch time? A. Yes."

The water boy for the section gang testified:

"Q. Now during the time that you were working around there on the day that Augustine died, did you see him at any time when he appeared to be sick? A. Well, I see him sick a little bit like this.

"Q. You mean he had his arm over his forehead? A. Yes.

"Q. Put your arm that way. A. Up?

"Q. And was that in the morning or in the afternoon? A. The afternoon."

5. Trujillo further testified:

"Q. Now, Mr. Trujillo, can you describe what Augustine looked like when he walked up to Mr. Jantz [the foreman]? A. He was a little shakey and pale.

"Q. He was pale and shakey? A. Yes.

"Q. Now was his whole body shaking? A. Just his arms. He was standing like this (witness indicates) he was shaking this way."

6. The foreman testified:

"Q. Did you ask him what was wrong with him? A. No, I didn't."

keeper and then leave.[7] No apparent concern was shown for his physical condition, even though an automobile was available to assist employees to a doctor.[8]

It is the well-established rule of law that the standard of care to be exercised by an employer must be commensurate to the dangers of the business. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967. We believe that the circumstances of high environmental heat, together with hard labor, compels the employer in the exercise of due care to recognize certain elemental facts about heat stroke. A charge of negligence is sustainable alone on the failure to recognize its outward manifestions.

Heat stroke is a true medical emergency requiring immediate action if the person's life is to be saved.[9] Paleness, shakiness and vomiting are symptoms.[10] A person does not pass out right away, although he even-

---

7. The foreman testified:

"Q. And what was the conversation? A. He told me he wasn't feel [sic] too well, he wanted to take off the rest of the day.

"Q. What did you say? A. I told him to go tell the timekeeper to check in with the timekeeper and he could take off."

8. The foreman testified:

"Q. A man gets sick, Mr. Jantz, on the job, what is the procedure for getting him to go to the doctor at that hospital? A. Well, we make arrangements to take him. We have an automobile there. We will take him in the automobile, or if we are working out on the road where we just have a motor car, we will take him on the motor car. We will get him to the doctor someway."

9. Dr. Jeffrey testified:

"Q. Now, a true heat stroke, Doctor, is one of the real true medical emergencies, isn't it? It is something that you have to take fast steps to do something about in order to have a chance to save the life of the person who is having that stroke? A. That's right.

"Q. Because if you said you have this paralysis of the heat control up here and the body is getting hotter and hotter— A. Yes.

"Q. It requires immediate action if you are going to have much of a chance at all to save that person's life, isn't that true? A. Yes."

10. Dr. Kolins testified:

"Q. Now, Doctor, would paleness of an individual be symptoms of— A. Yes, that would be a late symptom after they have got into collapse.

"Q. Would shakiness on the part of the individual— A. Yes, that is a symptom."

*     *     *     *     *

"Q. Would vomiting or upset stomach be a symptom of this? A. It could be, yes.

*     *     *     *     *

"Q. Doctor, I think you said that the paleness is a late symptom of heat stroke, generally present after the collapse, is that right? A. The paleness is part of the collapse.

"Q. And by collapse do you mean a— what it does mean to me—I mean that you fall to the ground? A. No, I mean circulatory collapse.

"Q. Circulatory collapse? A. Yes.

"Q. In other words, blood is not circulating through the body in the normal fashion? A. That's right.

*     *     *     *     *

"Q. Now, Doctor, one other question: Here, these symptoms, such as inability to walk, mental confusion and inability to speak and I believe Mr. Evans said, or you brought out, that these are symptoms of heat stroke, is that correct?

tually goes into a coma.[11] The exertion of walking one-quarter or one-half mile would tend to aggravate or to bring on the final state of heat stroke.[12]

The rule of law to be applied in examining the foregoing evidence is "simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injuries or death for which damages are sought." Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 448, 1 L.Ed.2d 493. The question is whether Augustin's death was due in whole or in part to failure of appellant's agent to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation. Anderson v. Atchison, T. & S. F. Ry. Co., 333 U.S. 821, 68 S.Ct. 854, 92 L.Ed. 1108.

Wholly independent of the appellant's duty to furnish medical assistance, and preliminary to any consideration of that question, the jury could conclude that a reasonable and prudent man would suspect the possibility of heat stroke under the circumstances of the situation, and hence that due care was not used in failing to make some reasonable effort to determine the nature and extent of Augustin's illness; in failing to direct him to the doctor's office rather than ordering him to check in with the timekeeper; in failing to make some reasonable effort to place Augustin in a

A. That's right.
"Q. Now, are those symptoms that occur just before collapse? A. That's right.
"Q. The other symptoms, the paleness, the trembling, the vomiting, or [sic] early symptoms, is that right, Doctor? A. Yes, trembling.
"Q. Earlier than the others? A. Yes."

11. Dr. Kolins testified:
"Q. Does a person, Doctor, suffer an attack of heat stroke immediately? In other words, does he just walk out and start doing this work under this kind of heat? Does he—does the attack come on immediately? Does he pass out right away? A. No, it takes time to develop.
*  *  *  *  *
"Q. Let me ask you this: Doesn't the person eventually go into a coma, or pass out, from heat stroke? A. Yes."

12. Dr. Kolins testified:
"Q. * * * Doctor, given this situation this hypothetical question, a man at approximately two-forty-five is in a condition where he is pale, he is trembling, and he has been working all day long at hard physical labor and he walks, about, say a quarter of a mile, or a half mile, would that walking that exertion tend to aggravate or to bring on the final state of heat stroke? A. It would, yes."

Dr. Jeffrey testified:
"Q. Doctor, Mr. Evans asked you if the mere walking from this area to over here where this man was found would do anything that might have caused the death of this man. Giving you the same set of facts that this man walks up to his foreman and assume that he is on the verge of collapsing from heat stroke, would the walk from here to here tend to aggravate that condition at all? A. Certainly it would aggravate it, it aggravates anything.
"Q. In other words, walking in that intense heat is just more exercise, isn't that correct? A. Yes, the entire picture is a picture of exertion."

384

position where he could obtain medical attention if necessary by using the available automobile, or sending a fellow-employee along to see that Augustin arrived at the doctor's office safely. There are other possible inferences from which a conclusion of negligence could be drawn.

It is also our opinion that the duty to furnish medical attention does not alone spring from a moral certainty. If an employer in the exercise of due care would or should have known that an employee might suffer loss of life or serious bodily harm unless medical aid was provided, the duty to take affirmative action arises. Therefore, the jury could conclude that where, as here, there was an apparently healthy male in the prime of life working in the presence of high environmental heat who developed nausea, circulatory collapse and motor disorder, a reasonable and prudent man would believe that the employee was suffering from heat stroke. In order to hold as a matter of law that there was no negligence, it must be said that where men are being worked in the sun in temperatures of 100 degrees or higher, a reasonable and prudent man would not anticipate heat stroke. We think that fair-minded men could believe to the contrary and with reason find that loss of life or serious bodily harm would be suffered unless medical aid was provided.

We have considered the remaining questions not passed upon by the majority, and in our opinion they are wholly without merit; accordingly we would affirm the judgment.

J. MERCER JOHNSON, Justice, being disqualified, the Honorable GORDON FARLEY, Judge of Superior Court, Santa Cruz County, was called to sit in his stead and participated in the determination of this appeal.