338 P.2d 803

Charles FIGUEROA and Betty Figueroa,
husband and wife, Appellants,

v.

James A. MAJORS and Charlotte Majors,
husband and wife, Appellees.

No. 6448.

Supreme Court of Arizona.

April 29, 1959.

May, Lesher & Dees, and Robert O. Barber, Tucson, for appellants.

Joseph H. Riley, John P. Sullivan and Nick Knez, Tucson, for appellees.

JOHNSON, Justice.

This is an appeal from a judgment entered on a directed verdict in favor of the defendants, James A. Majors and his wife, in an action brought to recover damages for an injury sustained by the plaintiff, Charles Figueroa, which was alleged to have been caused by the negligence of said defendants.

The complaint of plaintiff alleged that on or about May 30, 1955, while in the employ of defendants, he was directed to drive a truck and trailer owned by defendants from Tucson, Arizona to Ruidoso, New Mexico. It was further alleged that plaintiff, as directed, undertook to drive defendants' vehicle to New Mexico; that said truck and trailer were not fit for reasonably safe operation on the highways; and that defendants knew, or in the exercise of reasonable care should have known, that they were not reasonably safe. It was further alleged that as a result of the unsafe condition of the vehicles provided by the defendants, the truck and trailer overturned while being driven near Hatch, New Mexico, causing total and permanent injuries to the plaintiff.

At the conclusion of the plaintiff's case defendants moved for a directed verdict on the grounds that plaintiff had introduced no evidence to show any negligence on the part of the defendants. The trial court granted the motion for a directed verdict on the grounds that the evidence was too speculative to establish liability. Therefore, we are concerned only with the question whether there was error in directing a verdict in favor of the defendants.

It is well settled in this jurisdiction that a motion for a directed verdict for the defendant admits the truth of whatever competent evidence the opposing party has introduced, including all inferences that reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the opposing party. Matsumato v. Arizona Sand & Rock Company, 80 Ariz. 232, 295 P.2d 850, 56 A.L.R.2d 1385; Savage v. Boies, 77 Ariz. 355, 272 P.2d 349; Gallaway v. Smith, 70 Ariz. 364, 220 P.2d 857; Nichols v. City of Phoenix, 68 Ariz. 124, 202 P.2d 201. It is further fundamental that a verdict will not be directed where the evidence on material facts is conflicting, or where on undisputed facts reasonable and fair-minded men may differ as to the inferences and conclusions to be drawn, or where different conclusions might reasonably be

reached by different minds, and thus the question of negligence and proximate cause is one of fact to be submitted to the jury and not a question of law for the court; if, upon all the facts and circumstances, there is a reasonable chance or likelihood of the conclusions of reasonable men differing, then the question is one for the jury. Cope v. Southern Pacific Co., 66 Ariz. 197, 185 P.2d 772; Durham v. Firestone Tire & Rubber Co. of California, 47 Ariz. 280, 55 P.2d 648; Matsumato v. Arizona Sand & Rock Company, supra.

With these rules in mind we will review the plaintiff's evidence which reveals the following facts:

The defendants were the owners and breeders of race horses, and four or five days prior to the accident involved herein they employed the plaintiff to exercise, groom and generally care for the defendants' horses. Plaintiff had been given instructions to drive defendants' truck and horse trailer, with two horses, from Tucson, Arizona, to join defendant in New Mexico. In accordance with such instructions the plaintiff, on May 30, 1955, at about 9:00 o'clock p. m., with his cousin, Johnny Figueroa, loaded two horses on the four-wheel or tandem trailer, hitched it to the truck and left for New Mexico. The trailer, loaded with two horses, weighed about 3600 pounds. Plaintiff drove the entire distance from Tucson to the place of the accident, a distance of about 250 miles. The accident occurred near Hatch, New Mexico, at about 5:00 a. m. the next morning.

The trailer was connected to the truck with a hitch consisting of three principal parts: (1) a bar assembly or "hitch", welded to and a part of the rear of the towing truck; (2) a bolt, which fitted through a hole on the bar, was secured below it by a nut, and which carried at its top, as a part of it, a 2-inch "ball"; which fitted into (3) a socket, which was part of the trailer. The ball was secured in the socket by a lever which was a part of the socket assembly, and once seated the ball could not be tightened in the socket as there was no adjustment on the socket.

Near Hatch, New Mexico, on a straight highway with only a slight grade, the plaintiff and his cousin suddenly felt a jerk or a pulling of the trailer. Plaintiff looked back and saw the trailer, which had been tracking behind the truck, veer off sideways at a sharp angle to the left. Plaintiff then applied the electric brakes to the trailer and they had become disconnected and did not work. At that time the trailer was not connected to the truck except by the safety chain. The trailer then "jackknifed" back and forth and caused the truck to turn over.

Plaintiff was pinned in the wreckage, his spine fractured and his spinal cord completely severed.

In addition to the ball and socket assembly the trailer was connected to the truck with one safety chain, located on the side of the trailer tongue. The purpose of the trailer chain was to hold the trailer to the truck in the event the ball and socket assembly became disconnected.

After the accident an inspection of the hitch assembly revealed that the ball had broken off the top of the bolt which went through the hitch or bar attached to the truck. The ball was never found. The remainder of the bolt was taken from the hitch or bar after the accident and later used by a metallurgist to make certain tests, which will be detailed later. The entire hitch assembly was introduced in evidence, with the exception of the ball, which as stated was never found.

It is plaintiff's position that the defendants owed him a duty to use reasonable care to furnish a safe truck and trailer; that there was a breach of this duty in furnishing a hitch assembly that was defective and unsafe; and that the defendants should, in the exercise of reasonable care, have known that such hitch assembly was not safe.

John K. Anthony, a professor of metallurgy at the University of Arizona, called as a witness for the plaintiff, testified that after the accident he made an examination of the bolt used in the hitch assembly of defendants' truck and trailer to determine what caused the break or fracture of the ball. He testified as follows:

"Q. Now were you able, on the basis of that investigation and examination, to tell with reasonable certainty which of these general causes made that thing [referring to the bolt ball asssembly] break? A. Yes.

"Q. And what did? A. In my opinion, it is a typical fatigue or progressive type of fracture.

"Q. Will you tell us, recognizing that we are laymen in the field and using as simple language as possible, what fatigue is and what causes the fracture in the metal? A. Fatigue is the tendency to fracture under reverse stresses that is below the ultimate tensile strength of the metal.

"Q. Is this the same thing that in the profession a century ago, even among laymen, is spoken of as crystallization of metal? A. Yes.

\*     \*     \*     \*     \*     \*

"Q. Do I understand from your description that the cause of fatigue is the repeated back and forth stress and strain on the metal? A. Yes."

The metallurgist further testified that the fact the ball did not fit tightly in the socket assembly, but was somewhat loose, would cause fatigue more rapidly and break sooner. He also testified that the fact that the bolt which went through the hole in

the bar attached to the towing truck was loose and moved back and forth, would have the same effect and cause fatigue more rapidly.

James A. Majors, one of the defendants, testified on cross-examination that for the past fifteen years his principal business has been race horse trainer and owner; that during that period of time he had considerable experience in pulling or towing trailers carrying horses. He further testified that the tandem trailer involved in the instant case was purchased by him in 1952 and used continuously since that time in hauling horses throughout the western states; that at all times since the purchase of the trailer the defendants have used the same two-inch ball and socket assembly that was originally furnished by the manufacturers of the trailer. The defendant was uncertain when he had last inspected the hitch assembly but thought it was at least two months prior to the accident involving the plaintiff.

Cecil Cavender, a witness for the plaintiff, testified that he had for many years used a ball and socket type assembly in pulling horse trailers, and was experienced in the use of such assembly. It was his opinion from an examination of the bolt from which the ball was missing, that such bolt did not fit "snugly" into the hole of the bar assembly attached to defendants' truck; that the bolt had evidence of wear on the top side under the ball, from motion or "play" between the bolt and the hole in the bar assembly, and that the worn part was visible on the threads of the bolt.

Mr. Cavender further testified:

"Q. Mr. Cavender, in your opinion, is it a proper standard to follow in hooking up balls on trailer hitches to have the hole of it in the hitch part of the assembly larger than the bolt on the ball?

\*    \*    \*    \*    \*    \*

"A. You are going to have trouble with any trailer hitch that the bolt does not fit snugly through the hole into the bar."

Mr. Barber:

"Q. You mean by that, the shoulders fit tightly? A. If it doesn't fit tight, you are going to get play in there and the longer it goes, you are going to get more play.

"Q. What is the final result of that? A. It will heat it and break it off.

"Q. Is that a well-recognized danger among people who use ball and socket trailer hitches, that any looseness will cause a friction? A. It certainly is. Whenever you get one that's loose in motion, you are going to have trouble with it."

The witness then gave his opinion that the cause of the ball breaking off the bolt in the instant case was because of the

looseness of the bolt in the bar assembly attached to the truck.

George Audish, a witness called by plaintiff, testified that he had been in the welding business since 1944, which included installing and repairing trailer hitches, particularly ball and socket type assemblies; that he had found from his experience with this type of assembly that if there is any looseness between the ball and the trailer socket, or between the bolt and bar assembly attached to the towing vehicle, the continuous jolting of the vehicles and road vibration would cause crystallization of the metal, resulting in the ball breaking.

The witness made an examination of the trailer hitch used on the truck of the defendants, and found that the bolt did not fit tightly in the hole of the bar assembly, that it was his opinion that a loose-fitting bolt would hasten crystallization; and that from his inspection of the bolt it crystallized and broke.

Mr. Audish further testified that the type of tongue hookup assembly or socket installed on the trailer of the defendants would not take up the slack caused by wear and tear on the ball because the socket spring did not have enough tension to hold the socket securely against the ball. The witness then testified:

"Q. Mr. Audish, would a two-inch ball used in that socket for a period of three years in general ranch use, which had gone to Tijuana and to Colorado and made numerous trips over a period of three years, be looser or tighter than that two-inch ball that you have there? A. It would wear. In a year's time, it will cut down a sixteenth of an inch smaller, approximately.

"Q. Then your answer is it would be looser? A. It would, yes, sir.

"Q. Now then a ball riding loose then on a socket or a pin riding loose in a hitch would hasten the crystallization of a ball, would it not? A. Definitely."

John Rhodes, a rancher and rodeo contestant, testified that he had experience with, and had used, the ball and socket type assembly since 1921; that when he used such assembly and when he rode with other men using the same, they were particularly cautious in keeping the socket over the ball and bolt tight, otherwise there would be friction that would wear and cause them to crystallize and break.

· Plaintiff also presented evidence that two safety chains are necessary to attach the trailer to the truck, independent of the ball and socket assembly, so that if the hitch assembly should break, the trailer, towed by two chains, would continue to follow or "track" behind the truck. It was undisputed that the trailer belonging to the defendants was attached to the truck by only one chain. One witness testified that

a three-point hookup, that is, a chain from each angle of the trailer hitch to each angle of the tow bar, was the recognized safe method of the use of chains.

Considering all the evidence in the light most favorable to the plaintiff, we conclude that there was sufficient evidence of circumstances from which legitimate inferences might be drawn that the defendants, as persons experienced for many years in the use of trailers, knew or should have known by the exercise of ordinary and reasonable care that: (1) unless the bolt attached to the bar assembly connected to the towing truck fit tightly that road vibration and continuous use would cause crystallization of the metal resulting in the breaking of the bolt; (2) the socket type assembly attached to the trailer could not be tightened over the ball to take up the slack caused by wear from continuous use, resulting in crystallization of the ball because of such looseness; (3) providing one safety chain between the truck and trailer instead of two was not the recognized safe method; (4) reasonable inspection was necessary in the continuous use of a ball and socket type assembly; and (5) a loose fitting hitch assembly creates a dangerous condition unsafe for operation on the highway.

We are of the opinion, applying the rules mentioned above, that each of these issues are open to different conclusions when considered by reasonable and fairminded men, and that the plaintiff made a prima facie case against the defendants. Therefore the trial court erred in taking the case from the jury by instructing a verdict against the plaintiff.

Judgment reversed and the cause remanded for a new trial.

PHELPS, C. J., and STRUCKMEYER, UDALL and BERNSTEIN, JJ., concur.