[L.A. No. 27674. In Bank. April 21, 1964.]

CHESTER M. VANDERMARK et al., Plaintiffs and Appellants, v. FORD MOTOR COMPANY et al., Defendants and Respondents.

Edward L. Lascher and Donald C. Lozano for Plaintiffs and Appellants.

Eugene P. Fay, Edward I. Pollock and Pollock, Pollock & Fay as Amici Curiae on behalf of Plaintiffs and Appellants.

Dryden, Harrington, Horgan & Swartz, Vernon G. Foster, Moss, Lyon & Dunn, Gerold C. Dunn and Henry F. Walker for Defendants and Respondents.

TRAYNOR, J.—In October 1958 plaintiff Chester Vandermark bought a new Ford automobile from defendant Lorimer Diesel Engine Company, an authorized Ford dealer doing business as Maywood Bell Ford. About six weeks later, while driving on the San Bernardino Freeway, he lost control of the car. It went off the highway to the right and collided with a light post. He and his sister, plaintiff Mary Tresham, suffered serious injuries. They brought this action for damages against Maywood Bell Ford and the Ford Motor Company, which manufactured and assembled the car. They pleaded causes of action for breach of warranty and negligence. The trial court granted Ford's motion for a nonsuit on all causes of action and directed a verdict in favor of Maywood Bell on

the warranty causes of action. The jury returned a verdict for Maywood Bell on the negligence causes of action, and the trial court entered judgment on the verdict. Plaintiffs appeal.

Vandermark had driven the car approximately 1,500 miles before the accident. He used it primarily in town, but drove it on two occasions from his home in Huntington Park to Joshua Tree in San Bernardino County. He testified that the car operated normally before the accident except once when he was driving home from Joshua Tree. He was in the left-hand westbound lane of the San Bernardino Freeway when traffic ahead slowed. He applied the brakes and the car "started to make a little dive to the right and continued on across the two lanes of traffic till she hit the shoulder. Whatever it was then let go and I was able to then pull her back into the road." He drove home without further difficulty, but before using the car again, he took it to Maywood Bell for the regular 1,000-mile new car servicing. He testified that he described the freeway incident to Maywood Bell's service attendant, but Maywood Bell's records do not indicate that any complaint was made.

After the car was serviced, Vandermark drove it in town on short trips totaling approximately 300 miles. He and his sister then set out on another trip to Joshua Tree. He testified that while driving in the right-hand lane of the freeway at about 45 to 50 miles per hour, "the car started to make a little shimmy or weave and started pulling to the right. ... I tried to pull back, but it didn't seem to come, so I applied my brakes gently to see if I could straighten her up, but I couldn't seem to pull her back to the left. So, I let off on the brakes and she continued to the right, and I tried again to put on the brakes and she wouldn't come back, and all of a sudden this pole was in front of me and we smashed into it." Plaintiff Tresham testified to a substantially similar version of the accident. A witness for plaintiffs, who was driving about 200 feet behind them, testified that plaintiffs' car was in the right-hand lane when he saw its taillights come on. The car started to swerve and finally skidded into the light post. An investigating officer testified that there were skid marks leading from the highway to the car.

Plaintiffs called an expert on the operation of hydraulic automobile brakes. In answer to hypothetical questions based on evidence in the record and his own knowledge of the braking system of the car, the expert testified as to the cause of the accident. It was his opinion that the brakes applied them-

selves owing to a failure of the piston in the master cylinder to retract far enough when the brake pedal was released to uncover a bypass port through which hydraulic fluid should have been able to escape into a reservoir above the master cylinder. Failure of the piston to uncover the bypass port led to a closed system and a partial application of the brakes, which in turn led to heating that expanded the brake fluid until the brakes applied themselves with such force that Vandermark lost control of the car. The expert also testified that the failure of the piston to retract sufficiently to uncover the bypass port could have been caused by dirt in the master cylinder, a defective or wrong-sized part, distortion of the firewall, or improper assembly or adjustment. The trial court struck the testimony of the possible causes of the failure of the piston to retract, on the ground that there was no direct evidence that any one or more of the causes existed, and it rejected plaintiffs offer to prove that all of the possible causes were attributable to defendants. These rulings were erroneous, for plaintiffs were entitled to establish the existence of a defect and defendants' responsibility therefor by circumstantial evidence, particularly when, as in this case, the damage to the car in the collision precluded determining whether or not the master cylinder assembly had been properly installed and adjusted before the accident.

Accordingly, for the purposes of reviewing the nonsuit in favor of Ford and the directed verdict in favor of Maywood Bell on the warranty causes of action, it must be taken as established that when the car was delivered to Vandermark, the master cylinder assembly had a defect that caused the accident. Moreover, since it could reasonably be inferred from the description of the braking system in evidence and the offer of proof of all possible causes of defects that the defect was owing to negligence in design, manufacture, assembly, or adjustment, it must be taken as established that the defect was caused by some such negligence.

Ford contends, however, that it may not be held liable for negligence in manufacturing the car or strictly liable in tort for placing it on the market without proof that the car was defective when Ford relinquished control over it. Ford points out that in this case the car passed through two other authorized Ford dealers before it was sold to Maywood Bell and that Maywood Bell removed the power steering unit before selling the car to Vandermark.

 In *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal. 2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897], we held that "A

manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.'' Since the liability is strict it encompasses defects regardless of their source, and therefore a manufacturer of a completed product cannot escape liability by tracing the defect to a component part supplied by another. (*Goldberg* v. *Kollsman Instrument Corp.*, 12 N.Y.2d 432, 437 [240 N.Y.S.2d 592, 191 N.E.2d 81].) Moreover, even before such strict liability was recognized, the manufacturer of a completed product was subject to vicarious liability for the negligence of his suppliers or subcontractors that resulted in defects in the completed product. (*Dow* v. *Holly Manufacturing Co.*, 49 Cal.2d 720, 726-727 [321 P.2d 736]; *Ford Motor Co.* v. *Mathis*, 322 F.2d 267, 273; *Boeing Airplane Co.* v. *Brown*, 291 F.2d 310, 313; see Rest., Torts, § 400.) ▇ These rules focus responsibility for defects, whether negligently or nonnegligently caused, on the manufacturer of the completed product, and they apply regardless of what part of the manufacturing process the manufacturer chooses to delegate to third parties. ▇ It appears in the present case that Ford delegates the final steps in that process to its authorized dealers. It does not deliver cars to its dealers that are ready to be driven away by the ultimate purchasers but relies on its dealers to make the final inspections, corrections, and adjustments necessary to make the cars ready for use. Since Ford, as the manufacturer of the completed product, cannot delegate its duty to have its cars delivered to the ultimate purchaser free from dangerous defects, it cannot escape liability on the ground that the defect in Vandermark's car may have been caused by something one of its authorized dealers did or failed to do.

▇ Since plaintiffs introduced or offered substantial evidence that they were injured as a result of a defect that was present in the car when Ford's authorized dealer delivered it to Vandermark, the trial court erred in granting a nonsuit on the causes of action by which plaintiffs sought to establish that Ford was strictly liable to them. ▇ Since plaintiffs also introduced or offered substantial evidence that the defect was caused by some negligent conduct for which Ford was responsible, the trial court also erred in granting a nonsuit on the causes of action by which plaintiffs sought to establish that Ford was liable for negligence.

Plaintiffs contend that Maywood Bell is also strictly liable

in tort for the injuries caused by the defect in the car and that therefore the trial court erred in directing a verdict for Maywood Bell on the warranty causes of action. Maywood Bell contends that the rule of strict liability in the *Greenman* case applies only to actions against manufacturers brought by injured parties with whom the manufacturers did not deal. It contends that it validly disclaimed warranty liability for personal injuries in its contract with Vandermark[1] (see Civ. Code, § 1791; *Burr* v. *Sherwin Williams Co.,* 42 Cal.2d 682, 693 [268 P.2d 1041]), and that in any event neither plaintiff gave it timely notice of breach of warranty. (Civ. Code § 1769.)

■ Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. (See *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal. 2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897].) In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety. Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to

---

[1]The warranty clause of the contract provided: ''Dealer warrants to Purchaser (except as hereinafter provided) each part of each Ford Motor Company product sold by Dealer to Purchaser to be free under normal use and service from defects in material and workmanship for a period of ninety (90) days from the date of delivery of such product to Purchaser, or until such product has been driven, used or operated for a distance of four thousand (4,000) miles, whichever event first shall occur. Dealer makes no warranty whatsoever with respect to tires or tubes. Dealer's obligation under this warranty is limited to replacement, without charge to Purchaser, of such parts as shall be returned to Dealer and as shall be acknowledged by Dealer to be defective. This warranty shall not apply to any Ford Motor Company product that has been subject to misuse, negligence, or accident, or in which parts not made or supplied by Ford Motor Company shall have been used if, in the determination of Dealer, such use shall have affected its performance, stability, or reliability, or which shall have been altered or repaired outside of Dealer's place of business in a manner which, in the determination of Dealer, shall have affected its performance, stability, or reliability. This warranty is expressly in lieu of all other warranties, express or implied, and of all other obligations on the part of Dealer.''

the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship. ■ Accordingly, as a retailer engaged in the business of distributing goods to the public, Maywood Bell is strictly liable in tort for personal injuries caused by defects in cars sold by it. (See *Greenberg* v. *Lorenz*, 9 N.Y.2d 195, 200 [213 N.Y.S.2d 39, 173 N.E.2d 773]; *McBurnette* v. *Playground Equipment Corp.* (Fla.) 137 So.2d 563, 566-567; *Graham* v. *Butterfield's Inc.*, 176 Kan. 68 [269 P.2d 413, 418]; *Henningsen* v. *Bloomfield Motors, Inc.*, 32 N.J. 358, 406 [161 A.2d 69, 75 A.L.R.2d 1]; *State Farm Mut. Auto. Ins. Co.* v. *Anderson-Weber, Inc.*, 252 Iowa 1289 [110 N.W.2d 449, 455-456]; Rest.2d Torts (Tent. Draft No. 7) § 402A, com. *f*.)

■ Since Maywood Bell is strictly liable in tort, the fact that it restricted its contractual liability to Vandermark is immaterial. Regardless of the obligations it assumed by contract, it is subject to strict liability in tort because it is in the business of selling automobiles, one of which proved to be defective and caused injury to human beings. ■ The requirement of timely notice of breach of warranty (Civ. Code, § 1769) is not applicable to such tort liability just as it is not applicable to tort liability based on negligence (*Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57, 60-62 [27 Cal.Rptr. 697, 377 P.2d 897]; see Rest.2d Torts (Tent. Draft No. 7) § 402A, com. *m*). *Whitfield* v. *Jessup*, 31 Cal.2d 826 [193 P.2d 1], and *Vogel* v. *Thrifty Drug Co.*, 43 Cal.2d 184 [272 P.2d 1], on which Maywood Bell relies, dealt only with warranties arising under the uniform sales act (Civ. Code, §§ 1721-1800); neither of them considered the question whether the defendant might be subject to strict tort liability not arising under that act.

■ Although plaintiffs sought to impose strict liability on Maywood Bell on the theory of sales-act warranties, they pleaded and introduced substantial evidence of all of the facts necessary to establish strict liability in tort. Accordingly, the trial court erred in directing a verdict for Maywood Bell on the so-called warranty causes of action.

Plaintiffs contend finally that various prejudicial errors were committed in presenting the negligence causes of action to the jury and that therefore the judgment in favor of Maywood Bell on those causes of action should be reversed. The issue of Maywood Bell's liability for negligence was fully litigated. Although the evidence was in sharp conflict, we are convinced from an examination of the record that no prej-

udicial error occurred in presenting the negligence causes of action to the jury.

The judgment of nonsuit in favor of Ford Motor Company is reversed. The judgment in favor of Maywood Bell Ford on the negligence causes of action is affirmed and in all other respects the judgment in favor of Maywood Bell Ford is reversed.

Gibson, C. J., Schauer, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.