483 P.2d 1388

Lawrence R. READER and Sally Reader, his wife; Robert Reader, a minor, by his Guardian ad Litem, Lawrence R. Reader, Appellants and Appellees,

v.

GENERAL MOTORS CORPORATION, a Delaware corporation, Appellee,

Madison Chevrolet, an Arizona corporation, Appellant and Appellee,

Hertz Corporation, a Delaware corporation dba Hertz Rent A Car, Appellant.

No. 10284–PR.

Supreme Court of Arizona, In Banc.

April 22, 1971.

Rehearing Denied May 25, 1971.

Killian & Legg, by John G. Hough, Mesa, for the Readers.

Snell & Wilmer, by Roger W. Perry and Arthur P. Greenfield, Phoenix, for General Motors Corp.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by John H. Killingsworth and Jay M. Martinez, Phoenix, for Madison Chevrolet.

Fennemore, Craig, von Ammon & Udall, by Calvin H. Udall, Phoenix, for Hertz Corp.

HAYS, Vice Chief Justice.

This cause is before us on a petition for review of a decision of the Court of Appeals, Division One, which affirmed in part and reversed in part a judgment entered by the Superior Court of Maricopa County. Reader v. General Motors Corporation, 13 Ariz.App. 207, 475 P.2d 497 (1970). The opinion of the Court of Appeals is vacated.

On July 14, 1965, Lawrence R. Reader was driving a 1965 Chevrolet truck, 60 series, while in the process of delivering a load of watermelons for his employer, United Produce Company. His minor son, Robert, was with him. As Reader proceeded down Slate Creek Hill, a long, steep grade on State Highway 87, south of Payson, Arizona, the brakes completely failed. Reader applied the emergency brake and attempted to downshift the transmission but the vehicle continued to gain speed. After the truck had attained a speed of approximately 70 miles per hour, Reader grabbed his son and jumped. Both were severely injured. The truck went over an embankment and was extensively damaged.

The vehicle was manufactured by the Chevrolet Division of the General Motors Corporation. It left the assembly line with no van or bed and was delivered to Madison Chevrolet. Madison sold the truck to the Hertz Corporation and Hertz leased it to United. To meet the specific requirements of United, Hertz arranged to have the Fruehauf Trailer Company install a 20 foot van equipped with an ice bunker. Both Madison and Rudolph Chevrolet performed warranty repairs on the vehicle and, at the time of the accident, it was approximately six months old.

The Readers, plaintiffs hereinafter, brought this action against General Motors, Madison Chevrolet, Rudolph Chevro-

let and Hertz. The complaint charged and the action was tried on theories of negligence, strict liability in tort and breach of warranty. Hertz cross-claimed for indemnity against Madison, Rudolph and General Motors. Madison cross-claimed for indemnity against General Motors.

General Motors employed Fred H. Cady to investigate the cause of this accident. Cady, a specialist in accident analysis, examined the vehicle after it had been towed to the premises of Madison. His examination disclosed the absence of a certain clip (hereinafter referred to as Exhibit 61) which was designed to clamp the lower portion of the speedometer cable to a metal bracket located only a few inches from the frame. Instead, Cady discovered that someone had installed a different clip (identical to the one admitted into evidence and hereinafter referred to as Exhibit 62) which was holding the speedometer cable against the frame itself. This caused the speedometer cable to rub against the hydraulic brake tubing. The continuous rubbing action betwen the cable and the tubing wore the latter thin to the point where the weakened area could no longer withstand the normal hydraulic pressure when the brakes were applied. The tubing finally burst and the brake fluid escaped. This caused an immediate and complete loss of braking power. It was Cady's opinion, and it is undisputed by the parties, that the ultimate cause of the accident was brought about by the person who improperly clipped the speedometer cable to the frame of the truck. If the cable had been clipped to the metal bracket, it would not have come into contact with the brake tubing.

Cady testified that he took the clip, a section of the brake tubing and the speedometer cable to his place of business in California and subjected them to certain microscopic tests. Following this examination, he delivered these parts to General Motors; however, he stated that he did not know their present whereabouts. Although he was familiar with the process, Cady did not conduct a microphotographic study of the metal bracket to determine whether a clip had ever been installed thereon. Cady was unable to determine who installed the Exhibit 62 clip to the frame of the truck.

Robert J. Smith, an engineer with the Chevrolet Motor Division, testified that he was familiar with the design criteria for the 1965 Chevrolet truck, Series 60. He stated that a clip like Exhibit 62 is not used anywhere in the manufacture of 1965 Chevrolet trucks; that he had never seen an Exhibit 62 clip before this accident and that one man on the assembly line installs the metal brackets, routes the speedometer cable and fastens the cable to the bracket by means of an Exhibit 61 clip. He further testified that General Motors did not supply its dealers with Exhibit 61 clips. He explained that although the Chevrolet Division uses "thousands" of clips of various configurations, the dealers do not have to stock all of them because one clip can replace "maybe 20, 30 or 50 clips that we use for the original manufacture." Smith stated that Chevrolet dealers could determine the proper clip to use by referring to the Chevrolet Illustrated Truck Parts manual; however, when asked to do so, he was unable to locate in such manual an illustration of the metal bracket, the routing of the speedometer cable or a recommended clip to use in place of an Exhibit 61 clip.

Although Smith indicated that it would be dangerous to permit any contact between the speedometer cable and brake tubing, he also testified that every Chevrolet truck manufactured in 1965, including the smallest pick-up truck, was designed in such a way that both the speedometer cable and brake tubing were placed in close proximity to each other along the left side of the truck frame. He said that it was necessary for the brake tubing to be located along the left side of the frame because the master cylinder was placed on that side. The metal bracket was designed to prevent any contact between the speedometer cable and brake tubing. This bracket was located about three inches from the brake tubing.

The record indicates that Donald Hartman was the only mechanic employed by

Madison who performed warranty repairs on the subject vehicle. He testified from the warranty work orders which were placed in evidence. The work orders indicate that this truck was the subject of a number of complaints. One complaint was to the effect that the brakes would not stop the truck. To cure this ill, Hartman repaired the hydrovac to provide the proper vacuum assistance. He also replaced the upper portion of the speedometer cable which had broken but he stated that this section of the cable was completely segregated from the lower section, the part critical to this lawsuit. He also repaired the transmission on two separate occasions and this involved the disengagement of the upper portion of the speedometer cable. Hartman testified that none of the warranty repairs he performed on this vehicle involved the lower part of the speedometer cable and he was certain that he did not disturb this area in any manner. He stated that he did not install the Exhibit 62 clip and that he had no knowledge of the person or entity responsible for its installation.

Hartman also inspected the damaged vehicle after it had been returned to Madison. Thereafter, he examined some of the new 1965 Chevrolet trucks, Series 60, on Madison's new truck lot. He discovered that although an Exhibit 61 clip was installed on some, such clip was missing from the others. In one of the latter instances, the metal bracket was also missing and the speedometer cable was lying against the brake tubing. Hartman did not know if these vehicles had been through Madison's "get-ready" department at the time he examined them. He further testified that he had seen many trucks delivered by the Chevrolet factory with broken, omitted or defective parts.

Like Smith, Hartman was unable to determine from the truck manuals furnished by the Chevrolet Division what clip to use in the event the Exhibit 61 clip was missing. He stated that the manuals neither recommended a substitute clip nor the proper routing of the speedometer cable. He testified that if an Exhibit 61 clip was missing

and the speedometer cable was hanging loose, he would have to rely on his own common sense to determine how the cable should be clipped to the truck. Hartman admitted that he had seen clips like Exhibit 62 on frames of Chevrolet trucks prior to this accident.

Fruehauf's service manager, Melvin Daid, testified that Fruehauf did not stock Exhibit 62 clips and that Fruehauf's records did not indicate that such a clip was purchased in connection with the work Fruehauf performed on the vehicle. David also testified that the work Fruehauf performed did not require anyone to go near the area where the Exhibit 62 clip was found after the accident. He observed the work as it was performed and did not notice anyone near the critical area. Opal Moore, a Fruehauf mechanic who actually worked on this vehicle, testified that all such work was "ten feet away from the speedometer cable."

Hertz' city manager, Martin Sand, testified that Hertz purchased the truck from Madison; that Madison performed all of the pre-delivery service; that Hertz paid Madison for this service; that Hertz' preventive maintenance program did not involve the inspection of brakelines and that Hertz did not purchase or stock clips of any kind. Three of Hertz' mechanics who performed preventive maintenance on the vehicle testified that nothing in this program required them to go near the speedometer cable and they were certain that they did nothing which would involve any contact with this area. Larry Southwell, a Hertz mechanic, testified that he saw clips similar to Exhibit 62 on a new 1965 Chevrolet truck, Series 60, "on the rear near the frame holding the light wires and the cables going down the rear frame."

Robert Thude testified that he was a "service writer" for Rudolph and that he had seen clips similar to Exhibit 62 on 1965 Chevrolet trucks.

Dale C. Williams, a truck dealer since 1955, examined approximately 25 Chevrolet and GMC trucks a few days before he testified. He stated that he observed "35 or

40" clips identical to Exhibit 62 which were either fastening the light wires or speedometer cables to the truck frames. He also stated that various parts on Chevrolet and GMC trucks are interchangeable. From his testimony, three clips were admitted into evidence, all of which were identical to Exhibit 62. The first was affixing the speedometer cable to the frame of a 1964 Chevrolet truck, Series 80. The second was holding the tail light wires to the frame of a 1969 GMC truck. There were a number of such clips on this vehicle. The third was discovered holding the light wires to the frame of a brand new 1967 Chevrolet truck, Series 10, which was parked on the premises of Rudolph Chevrolet. Williams observed six or seven Exhibit 62 clips on a brand new 1967 GMC truck fastening the tail light wires against the frame. He found a clip holding the speedometer cable against the frame of a 1968 Chevrolet 2-ton truck. This clip was identical to Exhibit 62 except that it had a rubberized coating. Williams did not know whether he inspected any 1965 trucks. He was unable to identify the year of a number of these vehicles because their doors were locked.

On offer of proof, Williams would have testified that he examined a great number of Chevrolet pick-up trucks, some of which were manufactured in 1965, and that the brake lines on all of these vehicles were located on the right side of the frame although the brake cylinders were invariably located on the left side. This testimony would have been at variance with the testimony of Smith who stated that the brake lines of such vehicles were all located on the left side and that they had to be so situated because of the location of the master cylinders.

The trial court directed a verdict in favor of Rudolph and General Motors on all theories of liability advanced by the complaint and both cross-claims because "there was no knowledge that (the truck) was delivered from the factory with this clip, that is Exhibit 62, on it." The court also granted Madison's motion to strike the testimony of Thude and Williams on the ground that it had no relevance to Madison's liability. After Madison presented its evidence, the case was submitted to the jury.

The trial court instructed the jury only on the theory of negligence on the part of Hertz and/or Madison. The jury was instructed that negligence, if any, could only be determined from conduct that occurred after the vehicle was delivered to Hertz. The court also instructed the jury that there was no evidence from which it could reasonably find that the Exhibit 62 clip was installed prior to the sale and delivery of the truck to Hertz. It should be noted that the latter instruction effectively granted a directed verdict for Madison on the issue of strict liability in tort. However, the court did permit the jury to determine who installed the clip by submitting the following interrogatory which was answered by the jury as indicated:

"JURY INTERROGATORY

Who do you find installed the clip which held the speedometer cable to the frame and against the brakeline of the truck in question? (Place an X on the line following the answer which represents your finding.)

| | |
|---|---|
| The Hertz Corporation | ——— |
| Madison Chevrolet, Inc. | ——— |
| A person or corporation other than the Hertz Corporation or Madison Chevrolet, Inc. | ——— |
| Unable to make finding | X " |

The jury returned a verdict in favor of plaintiffs and against Hertz, awarding plaintiffs damages in the amount of $150,-000. The trial court thereupon entered a judgment against Hertz and in favor of Madison.

The Hertz Corporation has filed this appeal. All parties have submitted extensive briefs which collectively exceed 350 pages. The plaintiffs and Madison have cross-appealed for various relief in the event this Court disturbs their current status in this litigation. No party has challenged the

propriety of the directed verdict for Rudolph.

■ Hertz contends that the trial court committed reversible error by instructing the jury that it could not reasonably find from the evidence that the Exhibit 62 clip was installed prior to the sale and delivery of the vehicle to Hertz. We agree with this contention.

Most critical to a finding of ultimate liability in this case is the determination of the entity responsible for the installation of the clip which was the proximate cause of plaintiffs' injuries. Hertz was entitled to insist that the jury consider all of the evidence sufficient to support a finding that the clip was installed by an entity other than itself. If the jury was not permitted to find that the defect was created prior to the time the vehicle was sold and delivered, where the evidence was sufficient to support such a finding, Hertz was clearly prejudiced. The reason why the jury was unable to determine who installed the offending clip may well have been because it was instructed that it could not find from the evidence that the clip was installed before the vehicle was sold and delivered to Hertz. Because we have concluded, infra, that the evidence was sufficient to support a finding that the clip was present at the time the truck was sold to Hertz, we hold that the foregoing instruction was prejudicial to Hertz and that the judgment in favor of plaintiffs and against Hertz must be reversed. We now turn to the other issues raised on this appeal.

It is contended that the trial court erred in directing a verdict for General Motors because a prima facie case of strict liability in tort and negligence had been established by circumstantial evidence. It is well settled that a motion for a directed verdict admits the truth of all competent evidence introduced by the party opposing the motion, including all reasonable inferences to be drawn therefrom. Such evidence must be viewed most strongly against the movant and most favorably for the opposition. If, considering all the facts and circumstances, there is a reasonable likelihood that reasonable men may reach different conclusions, the question of fact in issue is to be decided by the jury. Figueroa v. Majors, 85 Ariz. 345, 338 P.2d 803 (1959); Vigil v. Herman, 102 Ariz. 31, 424 P.2d 159 (1967). The question of vital importance here concerns the kind and quantum of evidence necessary to survive General Motors' motion for a directed verdict.

■ This Court has previously approved the doctrine of strict liability in tort as found in § 402(a) [1] of the Restatement (Second) of Torts. O. S. Stapley Company v. Miller, 103 Ariz. 556, 447 P.2d 248 (1968). This theory of liability is not based upon traditional concepts of fault. However, as part of his prima facie case, the plaintiff has the burden of proving that the defective condition of the injury producing product was in being at the time it left the hands of the seller. General Motors insisted throughout the trial and suggests on this appeal that the plaintiffs must meet this burden by some kind of direct evidence. We do not agree. The plaintiffs must be permitted to rely upon circumstantial evidence alone. There will seldom be a case based upon strict liability where a person will be able to testify from his personal knowledge that a particular

---

1. "Special Liability of Seller of Product for Physical Harm to User or Consumer
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

product was sold in a certain defective condition. A requirement of direct evidence would effectively deny the theory of recovery of which we approved in Stapley, supra. We hold that the plaintiffs and Hertz were entitled to establish the pre-sale existence of the Exhibit 62 clip by circumstantial evidence. Darryl v. Ford Motor Company, 440 S.W.2d 630 (Tex. 1969); Elmore v. American Motors Corporation, 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84 (1969); Vandermark v. Ford Motor Company, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964).

A reasonable inference that a product was sold in a defective condition may be created by evidence negating other causes of such condition for which the seller would not be responsible. See Jakubowski v. Minnesota Mining and Manufacturing, 42 N.J. 177, 199 A.2d 826 (1964). The record indicates that the short life of this vehicle was traced to every garage that performed any maintenance or repairs thereon. Mechanics from each garage took the stand and described in detail all of the work that they performed on the truck. All of their testimony indicates that none of the services performed required any contact whatsoever with the critical area of the speedometer cable. Each mechanic testified that he did not disturb this area and all denied installing the clip which was the cause of this accident. This Court is of the opinion that this unimpeached testimony was sufficient to raise a reasonable inference that the defective condition of this vehicle was in being before it left the possession and control of Madison.

Additional evidence was offered for the purpose of establishing that clips identical to Exhibit 62 were not uncommonly found on Chevrolet and GMC trucks, both of which are manufactured by General Motors. Some of this evidence was received but much of it was rejected on the ground of irrelevancy. The testimony of Thude and Williams was eventually stricken from the record. The basis of the trial court's rulings appears to have been that such evidence had no probative value un-

less the clips were found on brand new 1965 Chevrolet trucks, Series 60.

By the general rule, evidence is relevant if it has any basis in reason to prove a material fact in issue. It is not necessary that such evidence be sufficient to support a finding of an ultimate fact; it is enough if the evidence, if admitted, would render the desired inference more probable. Udall, Arizona Law of Evidence, § 111 (1960). This rule is particularly important to a party who must rely wholly upon circumstantial evidence to establish his case. Here, the ultimate fact may be properly inferred from a number of separate facts any one of which may, standing alone, appear relatively insignificant. It is the opinion of this Court that the trial judge was too restrictive in his rulings relative to the evidence which tended to establish the existence of clips identical to Exhibit 62 on other Chevrolet and GMC trucks. There was testimony that this type of clip was found on a great number of these trucks and, in two cases, it was seen affixing the speedometer cable to the frame. There was testimony that various parts of Chevrolet and GMC trucks are interchangeable. The fact that the clip was found on trucks manufactured by General Motors in years subsequent to 1965 tends to support the accuracy of the previous testimony that it was seen on trucks manufactured in 1965 and prior and, taken together with the rest of the evidence, it strengthens the inference that this clip was not uncommonly used on Chevrolet trucks. We hold that it was error to strike the testimony of Thude and Williams. We further hold that the evidence was sufficient to sustain a finding that the offending clip was present on the truck at the time it was sold to Hertz. It was error for the trial court to direct a verdict for General Motors and to instruct the jury that it could not find that the clip was present when the vehicle was sold.

We are left with the question of whether the evidence was sufficient to sustain a finding of negligence on the part of General Motors and Madison.

The conceded cause of this accident conclusively shows that an unreasonable danger would be created if the speedometer cable was permitted to come into contact with and rub against the brake tubing. Smith indicated that General Motors was aware of this danger and stated that in designing the brake tubing, General Motors " * * * tried to keep (it) away from any other part of the vehicle. * * " Smith also testified that both the brake tubing and speedometer cable had to be routed in close proximity to each other on the left side of the frame of every Chevrolet truck, including pick-up trucks, because the master cylinder was located on the left side of the frame. However, Williams would have testified that he examined a large number of Chevrolet pick-up trucks, including those manufactured in 1965, and that although the brake cylinders were all located on the left side of the truck frame, the brake tubing was invariably located on the right side of the frame. It was error to exclude this testimony because it not only had a direct bearing on the issue of negligent design but it also attacked the credibility of Smith who testified as an expert witness.

Hartman testified that some 1965 Chevrolet trucks, Series 60, were delivered from the factory with the Exhibit 61 clip missing. In one case, the bracket was also missing and the speedometer cable was lying against the brake tubing. Madison's mechanics made the final inspections, corrections and adjustments necessary to make its new trucks ready for use. General Motors did not supply its dealers with Exhibit 61 clips but the evidence indicates that Exhibit 62 clips were commonly found on Chevrolet trucks affixing the light wires to the frames. Two were seen holding the speedometer cable against the frame. Both Smith and Hartman admitted that they were unable to find in the Chevrolet Illustrated Truck Parts manual an illustration of the metal bracket, the routing of the speedometer cable or a clip recommended for use in the event General Motors failed to attach the cable to the bracket with its factory (Exhibit 61) clip.

We are of the opinion that a jury could reasonably have found that this vehicle was negligently designed considering the apparent lack of necessity of placing the speedometer cable and brake tubing in close proximity to each other and the fact that General Motors failed to supply its dealers with instructions indicating how a potentially dangerous condition, of which it was aware, could have been avoided. Further, a jury could have reasonably found that Madison installed the offending clip and in a negligent manner. It was error to direct a verdict for General Motors and to instruct the jury to the effect that it could not find Madison guilty of negligence with respect to conduct occurring prior to the time this vehicle was sold to Hertz.

We find it unnecessary to discuss the other issues raised by the parties in view of our disposition of this case.

Reversed and remanded for further proceedings not inconsistent with this opinion.

STRUCKMEYER, C. J., and LOCKWOOD, J., concur.

NOTE: Justices JESSE A. UDALL and JAMES DUKE CAMERON disqualified themselves from the determination of this matter.