SWEETMAN CONSTRUCTION COMPANY, INC., Appellant v. DAKOTA PUMP, INC., Respondent

(226 N.W. 2d 792)

(File No. 11345. Opinion filed March 19, 1975)

May, Johnson & Burke and John E. Burke and John C. Quaintance, Sioux Falls, for plaintiff and appellant.

Shandorf, Bleeker & Boldt and Douglas R. Bleeker, Mitchell, for defendant and respondent.

WOLLMAN, Justice.

Plaintiff has appealed from a judgment entered on a jury verdict rendered in favor of defendant, contending that the trial court erred in denying plaintiff's motions for a directed verdict and for a new trial. We affirm.

On August 13, 1971, plaintiff entered into a contract with the town of Oacoma, South Dakota, for the construction of a municipal sewage system, which included, among other things, the installation of a sewer line and a prefabricated sewer lift station. Thereafter, plaintiff entered a contract with defendant whereby defendant agreed to supply certain equipment in accordance with the specifications set forth in the contract between plaintiff and the town. Pursuant to its contract with plaintiff, defendant furnished two self-priming sewage pumps and a prefabricated lift station.

Sometime early in 1972, plaintiff's employees picked up the lift station, together with the enclosed pumps and motors, control

board and related fixtures, at defendant's plant and transported it to the construction site at Oacoma where they installed it on a foundation next to the "wet well," a holding tank that had been constructed to hold the sewage collected by the system. The lift station was designed in such a manner that when the sewage rose to a certain level within the wet well one of the pumps within the lift station would automatically start and pump the sewage through a force main to a sewage lagoon. When the sewage had been pumped down to a certain level within the wet well, the pump then automatically stopped. When the sewage again rose to the predetermined level, the other pump would automatically start and operate until the sewage was pumped down. If the quantity of sewage flowing into the wet well was such that one pump could not handle it, the other pump would start.

On or about April 24, 1972, one of defendant's servicemen went out to the construction site for the purpose of starting up the pumps in the lift station. This start-up consisted of setting the starting controls, checking to see that the motors were drawing the right amount of current, and checking the pressure on the discharge line from the pumps. Plaintiff's project supervisor, who was present at the start-up, testified that immediately after being started the pumps were noisy and vibrated considerably. He told the serviceman that he thought the pumps sounded extremely noisy to him. The serviceman testified, however, that in his opinion the pumps were not noisier nor did they vibrate more than other pumps that he had worked with and that there was nothing about the noise or vibration that caused him any concern.

On May 11, 1972, the residents of Oacoma began hooking into the sewage collection line constructed by plaintiff. Plaintiff did not make these individual hookups and had no control over the manner in which they were accomplished.

On May 25 and on June 1, 1972, representatives of the Farmers Home Administration (FHA), the governmental agency that was providing financing to the town for the sewer project, checked the project and the lift station area. Subsequent to the inspection, plaintiff's job supervisor notified defendant that the

FHA was not accepting the pumps because of the noise and vibration.

On July 8, 1972, defendant's serviceman checked the pumps in response to a call from plaintiff and tightened the belts on one of the units. He testified that in his opinion the pumps appeared to be operating normally and that he observed nothing that caused him any concern about the operation of the pumps other than the fact that there appeared to be a lot of water coming into the wet well from the collection system, with the result that "the pumps were running a lot of hours at that time."

On July 21, 1972, the lift station flooded, causing the electrical controls on the pump motors to short circuit. Plaintiff was required to install some temporary pumps in the wet well in order to keep the sewage from backing up into the residences attached to the system.

After the lift station had been pumped dry, it was discovered that a lug bolt on the cover plate on one of the pumps had broken. This permitted the cover plate to open, which in turn resulted in sewage discharging from the pump into the lift station.

Plaintiff's job supervisor testified that after the lift station had been pumped out, he and his men took the inspection plates off the pumps and discovered no gravel in them. On the other hand, defendant's serviceman testified that when he opened the back of the pump on which the bolt had broken he found inside the pump "* * * about two or three hands full, big hands full of rocks and gravel."

Approximately one week later defendant's employees replaced the bearings in the pumps. On August 3, 1972, defendant informed plaintiff by letter that the lift station had been rebuilt. On August 7, 1972, plaintiff's job supervisor started the pumps and observed that they were still noisy and still had the same vibration problem. He testified that the pump on which the bolt had broken was the more noisy of the two and that it "* * * had extreme vibration, extremely bad." Because of this noise and vibration, the pumps were shut off and on the

next day plaintiff's job supervisor discussed the matter with defendant's service technician. Subsequently, pressure tests were run on the discharge line and the quieter of the two pumps was put into operation. On or about September 6, 1972, defendant replaced the pumps with two new ones of slightly greater efficiency but with a slightly smaller solid passing capacity. Following inspections on September 13 and October 3, 1972, the pumps and lift station were approved and accepted by the FHA and the town.

Plaintiff sought to recover from defendant the expenses it had incurred in pumping out the wet well and lift station following the flooding on July 21, 1972, totaling some $2,110.90. Plaintiff's complaint alleged that the pumps delivered by defendant were not in accordance with the specifications set forth in the contract and that as a result there was a component failure of the pumps which caused the lift station to be flooded. At the conclusion of its case, plaintiff amended its complaint to allege that the pumps were not in accordance with the specifications, and were not properly designed or manufactured and that under ordinary use there was a component failure of the pumps that caused the lift station to be flooded.

Defendant filed a counterclaim in the amount of $3,923.68 against plaintiff, alleging that the pump units had been damaged as a result of plaintiff's negligence in installing the lines leading to the lift station. The trial court directed a verdict against defendant on its counterclaim. Defendant has not appealed from this ruling.

We assume without deciding that the doctrine of strict liability, adopted by this court in Engberg v. Ford Motor Co., 87 S.D. 196, 205 N.W.2d 104, was correctly applied in this case. *But see* Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145; Rosenau v. City of New Brunswick, 51 N.J. 130, 238 A.2d 169; Titus, "Restatement (Second) of Torts, Section 402A and the Uniform Commercial Code," 22 Stanford Law Rev. 713 (1970).

Although plaintiff was entitled to establish through circumstantial evidence that a defect existed in the pump when it left the hands of defendant, see e. g., Reader v. General Motors

Corp., 107 Ariz. 149, 483 P.2d 1388; Vandermark v. Ford Motor Co., 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168; Kleve v. General Motors Corp., Iowa, 210 N.W.2d 568, this does not mean that plaintiff was entitled to a directed verdict on this issue. There was testimony from which reasonable persons could have concluded that the vibration and noise were not the result of an inherent defect in the pumps and that the breaking of the bolt holding the inspection plate on one of the pumps was caused by an unbalanced condition within the pump caused by a heavy density in the material passing through the pump. There was testimony to the effect that although the pumps were designed to pass three-inch solids normally found in sanitary sewer systems, they were not designed to handle gravel and rocks. From this evidence, and from the testimony that gravel and rocks were found in the damaged pump after the lift station was pumped dry, the jury could have concluded that the damage to the pump was the result of rocks and gravel entering the sewage system. The fact that the trial court directed a verdict on defendant's counterclaim and thus impliedly found that plaintiff had not been guilty of negligence in installing the sewer line to the lift station did not foreclose a finding by the jury that rocks and gravel had entered the line as a result of the hookups by the residents of Oacoma.

Because reasonable minds could have differed on the conclusions to be drawn from the evidence, the trial court correctly denied plaintiff's motion for a directed verdict. Myers v. Quenzer, 79 S.D. 248, 110 N.W.2d 840; Cowan v. Dean, 81 S.D. 486, 137 N.W.2d 337. Likewise, the evidence was sufficient to support the verdict and the trial court did not err in denying plaintiff's motion for a new trial. Meylink v. Minnehaha Cooperative Oil Co., 67 S.D. 187, 291 N.W. 572.

The judgment is affirmed.

All the Justices concur.