641 P.2d 906

Mary A. RHODES, individually, and as surviving spouse of Dawes A. Rhodes, Deceased, Plaintiff/Appellant,

v.

INTERNATIONAL HARVESTER COMPANY, a foreign corporation, Defendant/Appellee.

No. 2 CA–CIV 4046.

Court of Appeals of Arizona, Division 2.

Jan. 18, 1982.

Rehearing Denied Feb. 19, 1982.

Review Denied March 9, 1982.

Miller, Pitt & Feldman, P. C. by Richard L. McAnally, John L. Tully and David A. Thomson, Tucson, for plaintiff/appellant.

Lesher, Kimble, Clausen & Gothreau, P. C. by William Kimble, Tucson, for defendant/appellee.

OPINION

BIRDSALL, Judge.

This is a wrongful death products liability case in which the trial court directed a verdict in favor of the defendant-appellee, International Harvester. The plaintiff-appellant, Mary Rhodes, is the surviving spouse of Dawes Rhodes, who died as a result of injuries received when he became entangled in a cotton picker, designed, manufactured and sold by the appellee.

The appellant claims that her evidence was sufficient to take the case to the jury. We disagree and affirm.

The cotton picker was a Model 422 first produced by appellee in 1964. This particular machine was purchased by the decedent's employer in 1967. The decedent had used it ever since as "his machine." The accident occurred February 5, 1978.

The machine is designed to pluck cotton from plants while travelling through a cot-

ton field. The actual picking of the fibers is done by two sets of picking heads. The picking heads consist of spindles that rotate, catch the cotton fiber, and pull the fiber off the plants. The picking heads are located at the front of the machine. One set of picking heads is located on the right side of the front of the machine; the other on the left. The machine picks two rows of cotton at the same time. Once the spindles pull cotton fibers from the cotton plants a fan deposits the fibers in a large collection bin on top of the vehicle.

The machine is equipped with an operator's platform approximately seven feet above the ground at the front of the machine directly above the spindles. Access to the platform is provided by a ladder located directly in the center of the front of the machine, between the picking heads. The platform is approximately five feet wide.

The driver's seat for the vehicle is located on the lefthand side of the platform. The controls for the vehicle are located on the floor of the platform, in front of the operator's seat. When the machine is in operation and moving forward through a cotton field, it travels at a speed of approximately three or four miles per hour.

The platform is also equipped with a railing around most of its perimeter. The railing is constructed of metal tubing. Its height is 29¼ inches above the level of the platform. At the front center portion of the platform, there is an opening to permit access to the platform from the ladder. This opening is 13″ wide.

The machine is designed so that it can be driven by a single individual. The operator will climb the ladder to the platform, station himself behind the steering wheel, then place the machine in gear so that it is moving forward. Once the operator has placed the machine in gear, it will run under its own power until the operator brings the vehicle to a halt. In other words, unlike an automobile, there is no gas pedal that the operator must depress in order to keep the machine moving forward; once the machine is moving forward, it will continue to do so until the gears are manually disengaged.

During the course of an eight-hour day, it is common for the operator to stand to avoid the tedium of driving the vehicle and to stretch his muscles. The operator may steer the vehicle from a standing position.

Occasionally, the picking heads become clogged by cotton fibers. For this reason, operators check to see if the heads of the machine have been clogged. To do so, the operator may look over the front of the platform and over the sides of the platform to see whether any cotton is coming from underneath the machine. This may be done while the machine is in operation, moving through the field, or the picker may be shut down and the heads checked.

To check the right picking head, the operator may stand up from the operator's seat, step up to the right side of the platform, and look over the side railing of the platform. In checking the left picking head, the operator may stand in the opening of the railing where the ladder is joined to the platform and look down at the front of the picker behind the ladder.

*Design Defect(s)*

■ The appellant's expert witness, the senior safety coordinator at the University of Arizona, gave his opinion that the cotton picker, when manufactured, was unreasonably dangerous because of design defects—specifically he testified that: 1) The railing around the platform should be 42″ high rather than 29¼″ and should also have a midrail; 2) there should be a gate or bar across the 13″ opening in the railing at the top of the ladder; 3) the ladder should be mounted on the side of the picker rather than the front where the moving machinery is located; and 4) the steps on the ladder were too far apart, the ladder is too narrow, and the handrails on the ladder should extend 42″ above the ladder.

The record contains sufficient evidence to raise a jury question on the theory of design defect. The test is the restatement definition found in *Byrns v. Riddell, Inc.*, 113 Ariz. 264, 267, 550 P.2d 1065, 1068 (1976):

"The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

In reviewing the record where a directed verdict has been granted, we must follow the rule set forth in *Reader v. GMC*, 107 Ariz. 149, 483 P.2d 1388 (1971):

"It is well settled that a motion for a directed verdict admits the truth of all competent evidence introduced by the party opposing the motion, including all reasonable inferences to be drawn therefrom. Such evidence must be viewed most strongly against the movant and most favorably for the opposition. If, considering all the facts and circumstances, there is a reasonable likelihood that reasonable men may reach different conclusions, the question of fact in issue is to be decided by the jury." 107 Ariz. at 154, 483 P.2d at 1393.

### Proximate Cause

■ Even though the plaintiff has sustained her burden of proof of a design defect, the evidence must also be sufficient to support a finding that the defect (or defects) were a proximate cause of the injury. In that regard the evidence is not sufficient and it is for that reason that the trial court properly ended the trial. Our consideration of the evidence on this issue is controlled by the same rule quoted from *Reader, supra.*

On the day of the accident the decedent was operating "his" picker in a cotton field. He was last seen before the accident by Alan Burns, who was driving a cotton picker in the same field. When Burns last saw the decedent, Rhodes' cotton picker was stopped. The engine was running but the vehicle was not in gear and the spindles in the front of the machine were not moving. The decedent was "checking the back doors" of the cotton picker. To do so, he had to take the machine out of gear so that it was stopped in the field, and he had to disengage the picking heads on the machine

so that the picking spindles were not turning. He then had to dismount from the platform and crawl under the back end of the machine to make sure that the rear doors were properly secured.

When last seen by Burns, he was just coming out from underneath the machine. He indicated to Burns that everything was okay at that time. Burns then proceeded on past the decedent's machine. When Burns got to the end of the field, he turned his machine around. He and Frank McSperrit, another operator, then looked in the direction of the decedent's cotton picker and saw a cloud of black smoke coming out from underneath the machine. They immediately proceeded to Rhodes' cotton picker and found the decedent trapped under the picker. They found that the machine was in gear and moving through the field. They also found that the left picking head was turning but the right head was not, because one of the decedent's feet had caught in the spindles of the head and prevented it from turning.

This evidence shows that the decedent had remounted the platform after checking the rear doors of the machine. This is the only explanation as to why the machine was moving again. Additionally, for the right picking head to be turning, he must have engaged the picking heads from the operator's platform. Although Rhodes was still alive, his condition did not permit him to tell anyone how the accident happened.

After the fatal accident, investigation disclosed a furrow in the field that showed the decedent had been dragged or pushed by the picker some 251'. An examination of the field traversed by the picker prior to the beginning of the furrow showed no unusual holes, mounds or other problems in the field that would have caused any extraordinary jolting of the machine. The decedent's pack of cigarettes and lighter were found approximately 100' before the point where the 251' furrow began. A mark where accumulated grease and dirt had been scraped was found above the right picking head at the front of the machine. Although a witness speculated that this had

been made by Rhodes when he "fell" from the platform, no evidence supports this conclusion. In *Charleston National Bank v. International Harvester Co.*, 22 Ill.App.3d 999, 317 N.E.2d 585 (1974), which involves a strikingly similar fact situation, there were hand prints on an air compressor located at a point on the machine permitting an inference that the decedent had clung to it prior to his fall. In the instant case there is no evidence showing that the mark was made by the decedent, much less by what part of his body it was made, or how he made the mark, if, in fact, he did.

The appellant theorizes that from this evidence the jury could infer that the decedent, having returned to the platform, fell from his position, either over the railing or through the 13″ opening at the top of the ladder, and that he would not have fallen if the railing had been 42″ high or there had been some guard across the opening. Such an inference would be speculative. The position in which the decedent was found relative to the machine does not lend support to the theory that he fell as opposed to any other plausible explanation of the accident. *See Charleston National Bank, supra.*

No evidence shows that the accident happened the way the appellant suggests. No evidence shows that the design of the railing contributed in any way to the accident. No evidence shows what the decedent was doing immediately prior to the accident, or that what he was doing was an intended or reasonably foreseeable use of the cotton picker. It is equally possible that the decedent was "misusing" the machine. For example, he might have attempted to leave the machine without stopping, to retrieve his cigarettes. The evidence clearly suggests such a conclusion. The appellant's burden was to establish proximate cause by a preponderance of the evidence. She produced all the evidence available and it does not satisfy this burden.

A discussion of the other issues presented is unnecessary to our decision.

Affirmed.

HOWARD, C. J., and HATHAWAY, J., concur.